**Allan G. DOYLE, Jr., Appellant,**

v.

**Patricia A. DOYLE, Appellee.**

**No. S–3780.**

Supreme Court of Alaska.

July 26, 1991.

---

Robert John, Law Offices of William R. Satterberg, Jr., Fairbanks, for appellant.

Robert B. Downes, Law Offices of Robert B. Downes, P.C., Fairbanks, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

### OPINION

BURKE, Justice.

Allan G. ("Grant") Doyle, Jr. and Patricia Doyle were married in October 1966 and divorced in December 1989. The marriage produced two children: a daughter, emancipated at the time of the divorce; and a

son, Allan G. Doyle III (Allan), born April 25, 1972.

The Doyles separated in July 1987 and Patricia moved into a place of her own. Allan, according to his own preference, remained with Grant in the family home. Patricia filed a divorce complaint in March 1989.

At the end of October and the beginning of November 1989, the superior court, Judge Richard D. Savell, held a two day trial. The court entered an order on January 4, 1990, *nunc pro tunc* to December 29, 1989, granting a decree of divorce and addressing all other issues in the case.

As to property division, the trial court generally adopted Patricia's version of personal and real property valuation, and then allocated individual items of property between Grant and Patricia in an explicit attempt to divide the total in half. The trial court ordered Grant to pay Patricia punitive substitution awards for certain items of missing personal property. The court further ruled against Grant in its child support and attorney's fees awards. Grant appealed each aspect of the superior court's decision.

## I

■ The trial court has broad discretion in property division cases. AS 25.24.-160(a)(4); *Moffitt v. Moffitt,* 749 P.2d 343, 346 (Alaska 1988). When a marriage is one of long duration and the parties have commingled their assets,[1] property division in divorce proceedings essentially consists of three steps: (1) determining what property is available for distribution; (2) placing a value on that property; and (3) allocating the property equitably. *Moffitt,* 749 P.2d at 346. If in the course of determining what property is available the trial court makes legal determinations, those legal determinations are reviewable under the independent judgment standard. *Id.* Otherwise, we review a trial court's determinations as to property available for distribution under the abuse of discretion standard.

*Id.* The second step, valuation of available property, is usually a factual determination to be upset on appeal only if there is clear error. *Id.* (citing Alaska R.Civ.P. 52(a)). The final step, a trial court's equitable allocation of property, is reviewable under the abuse of discretion standard, and this court will not disturb the trial court's allocation "unless it is clearly unjust." *Id.* (quoting *Wanberg v. Wanberg,* 664 P.2d 568, 570 (Alaska 1983)).

■ Additionally, the trial court must render findings of ultimate fact that support any decreed property division; the findings must be explicit and sufficiently detailed to give this court a clear understanding of the basis of the trial court's decision. *Lewis v. Lewis,* 785 P.2d 550, 552 (Alaska 1990); *Lang v. Lang,* 741 P.2d 1193, 1195 (Alaska 1987); *Merrill v. Merrill,* 368 P.2d 546, 547–48 (Alaska 1962).

Grant appeals three aspects of the trial court's division of property. We consider each in turn.

## A

■ Grant first argues that the trial court improperly chose the date of separation as the date on which to value the marital property for division purposes. The choice of valuation date especially affected division of the Doyles' real property, which consisted of three parcels—two in Fairbanks (the family residence and an unimproved lot) and one in Port Charlotte, Florida.

In 1985, the Doyles purchased the family home for almost $160,000 and the unimproved Fairbanks lot for $25,000. By the summer of 1987, when the Doyles separated, the family home had depreciated significantly. Evidence at trial indicated that the home continued to depreciate in 1988 and 1989, so that at the trial date in December 1989 it was worth only about $118,000. Evidence also indicated that the unimproved lot was worth about $20,000 at the trial date. The court awarded both Fair-

---

**1.** For the law governing property division when a marriage in divorce proceedings is of short duration and without significantly commingled assets, see *Rose v. Rose,* 755 P.2d 1121, 1125 (Alaska 1988).

banks properties to Grant, but valued them in its calculations as of date of separation: the family home at $127,500 [2] and the unimproved lot at $26,000.[3] In contrast, the Florida property had appreciated significantly during 1989. The court awarded that property to Patricia, valuing it, apparently as of date of separation, at $10,000.[4]

Grant argues that the trial court's use of separation date as valuation date effectively overvalued the Fairbanks properties he received and undervalued the Florida property Patricia received. As a result, Grant concludes that the court awarded Patricia approximately $25,000–$35,000 that does not appear in the court's calculations. We do not necessarily agree with the monetary figure that Grant offers as the erroneous result of the trial court's misvaluation. We do agree with Grant's assertion of error, however, inasmuch as he argues that the trial court improperly chose to value the divisible marital property according to its worth on the date of the Doyles' separation.

As we recently made clear in *Ogard v. Ogard*, 808 P.2d 815, 819 (Alaska 1991), the date on which the trial court values marital property generally "should be as close as practicable to the date of trial." In special situations, the trial court may value property as of the date of separation of the parties. *See id.* at 820. However, "[i]n that event, there should be specific findings as to why the date of separation is the more appropriate choice for valuation." *Id.* In the present case, the trial court did not explain *why* it considered the date of sepa-

ration to be an appropriate valuation date. Thus, on remand the trial court should value all of the marital property, including the real property, as of the date of the trial, unless the court specifically finds that a special situation requires it to impose a different valuation date.[5]

### B

Grant next asserts that the trial court committed clear error when it valued the parties' personal property according to purchase price values that Patricia compiled. Grant argues that the trial court should have employed the fair market value of personal property in its calculations. Grant also argues that the trial court could have estimated fair market value from the testimony that his expert witness offered.

We have held that "[i]n valuing a marital asset, the court should look to the asset's fair market value." *Nelson v. Jones*, 781 P.2d 964, 970 (Alaska 1989). In *Nelson*, the asset at issue was a corporation, and we rejected a "book value" appraisal of the corporation's worth because it bore "little relationship to [the corporation's] fair market value." *Id.* at 970. Also, in *Richmond v. Richmond*, 779 P.2d 1211 (Alaska 1989), we rejected a "replacement cost" valuation of office equipment and ordered the trial court on remand to calculate the fair market value. *Id.* at 1214–15.

The personal property in the present case generally resembles the fungible office equipment at issue in *Richmond*. Thus,

2. The trial court computed a negative equity value of $13,714.55 for the family home by subtracting the amount still owed on the Doyles' mortgage at date of trial—$141,214.55—from the property value at date of separation. Grant's argument essentially is that the negative equity value placed on his side of the ledger should have been larger.

3. The trial court valued the unimproved Fairbanks lot at $26,000 on the date of separation and then subtracted $2,500 still owed on the property at date of separation. Thus, the unimproved lot entered Grant's side of the ledger with a total value of $23,500.

4. The Doyles had purchased the Florida lot in 1970 or 1971 for $10,000. Grant's witness, a

Florida real estate broker, testified that the lot probably was still worth only $7,000 to $10,000 in the summer of 1987. The broker also stated that real estate speculation in 1988 and 1989 had driven the value of the lot up to at least the $23,000 to $25,000 range. The trial court found the broker's testimony utterly unpersuasive as to value in 1989, yet sufficiently persuasive as to value in 1987 to justify imposition of the $10,-000 figure.

5. Because the trial court used the date of separation as valuation date, it ignored some payments on the Fairbanks properties that Grant made during separation. On remand, the trial court also should consider all payments during separation in its redivision of the marital property.

we conclude that fair market value is the appropriate index of valuation for the personal property here. Likewise as in *Richmond*, however, the fair market value evidence in this case, offered by Grant's witness, appears flawed. Indeed, the expert witness admitted on cross examination that she really did not understand the meaning of "fair market value."[6] On remand the trial court should calculate, in light of all available evidence, the fair market value of the personalty at the time of the trial, unless special circumstances require another valuation date. *See id.* at 1214–15.

## C

■ When the Doyles married in 1966, Grant had been in the Army approximately one year. In August 1985, almost exactly twenty years after joining the Army, Grant retired with the rank of major and began to receive a pension. The pension consisted of two components: $1,073 per month ordinary retirement pay and $413 per month disability pay. Upon dissolution of the marriage, the trial court awarded Patricia 47.5%—or, one-half ($\frac{1}{2}$) of nineteen-twentieths ($\frac{19}{20}$)—of the ordinary, nondisability portion of Grant's military pension. Grant contests this award. We disagree with Grant's assertion that the trial court abused its discretion on this point.

We repeatedly have held that, under all applicable federal and state laws, military pensions are divisible marital property upon dissolution of marriage. *Lang*, 741 P.2d at 1196 (trial court can award former spouse part of a military pension "if necessary to effectuate an equitable property division"); *see also Chase v. Chase*, 662 P.2d 944, 945–46 (Alaska 1983) (citing 10 U.S.C. § 1408(c)(1)). Thus, the trial court's decision to include Grant's military pension as part of the divisible marital property here was not an abuse of discretion.

The trial court also did not abuse its discretion in its calculation of the precise portion of Grant's pension that Patricia should receive. The trial court calculated Patricia's share of the ordinary pension as $\frac{1}{2}$ of $\frac{19}{20}$ because Grant and Patricia were married for approximately nineteen of the twenty years that Grant served in the Army. In *Chase*, the divorcing husband also had entered the military approximately one year prior to the marriage and had retired after twenty years of service. *Chase*, 662 P.2d at 945. We upheld an award in *Chase* of "one-half ($\frac{1}{2}$) of nineteen-twentieths ($\frac{19}{20}$) of [the retiree's] military retirement pay." *Id.* at 946. We likewise uphold the trial court's use of the factor $\frac{1}{2}$ of $\frac{19}{20}$ here because it fairly represents the wife's eligibility for a share of the pension in proportion to the number of years the parties' marriage and the husband's military service overlapped.[7]

## II

Soon after Patricia filed for divorce, tension between her on the one hand, and Grant and Allan on the other, turned to overt hostility. This hostility was especially apparent as the family attempted to achieve an interim division of personal

---

6. Grant's valuation expert described her understanding of the term "fair market value" as follows:

> I've always considered fair market value what anyone will pay for it. So ... fair-market value then, to me if I'm a seller, would be what I can get for it. If I'm a dealer, then fair-market value is what I can sell it for. And they're two different things.

By contrast, fair market value is a single, unitary figure, commonly defined as "[t]he amount at which property would change hands, between a willing buyer and a willing seller, neither being under compulsion to buy or sell and both having reasonable knowledge of the relevant facts." *Black's Law Dictionary* 597 (6th ed. 1990).

7. Grant argues that the trial court should have applied a factor of $\frac{1}{2}$ of 225/240—225 being the number of months Grant alleges that the marriage overlapped his 240 months of military service. It is true that in *Lewis v. Lewis*, 785 P.2d 550 (Alaska 1990) we endorsed marital property division of a "contingent stock interest ... similar to a nonvested pension" according to a monthly ratio. *Id.* at 556 & n. 9. However, in *Lewis*, the period in which the marriage and the accruing stock interest overlapped was quite brief—less than 18 months. *Id.* Thus, use of a monthly ratio in that case was sensible. Moreover, we note that the record in this case does not clearly support Grant's contention that his marriage overlapped his military service for precisely 225 months.

property. At an initial hearing in the case on May 10, 1989, the superior court entered a temporary order instructing Grant to relinquish certain items of personal property to Patricia. Allan and Grant placed the personal property outside of their home, under a tarp, and instructed Patricia to come for the property over Memorial Day weekend of 1989. When Patricia arrived to retrieve the property, some of the items the court had ordered Grant to relinquish were not under the tarp. Grant and Allan were not home. Someone acting on Patricia's behalf entered an open window and unlocked the house, allowing Patricia to take several items from inside.

On the next major holiday of the year, July 4, 1989, Allan entered Patricia's home while she was not there and removed several items of personal property. Allan left a note indicating that his act was reprisal for Patricia's Memorial Day intrusion. Among the items missing from Patricia's home after Allan's visit were her gold wedding band, a gold necklace, and a gold nugget.

■ As part of its decree in this case, the trial court ordered the missing three items of gold returned to Patricia. "If they are not returned within [fifteen days of this decree]," stated the court, "[Grant] shall pay [Patricia], within 60 days, $1,000 per item not returned." Grant argues that the trial court erred by imposing the $1,000 per item punitive substitution fine upon him. We agree.

■ The trial court's own explanation for its punitive order is not particularly clear. Some passages of the trial court's statement of decision on the record suggest that the court wished to punish Allan for his misconduct by punishing Grant. Other passages suggest that the court intended to punish Grant for his failure to control Allan in the past. As such, the court's imposition of the punitive awards might be characterized as an ill-advised attempt to exercise its criminal contempt power.[8] *See* AS 09.50.010(5); *Diggs v. Diggs,* 663 P.2d 950, 951 (Alaska 1983) (criminal contempt citations appropriate "in cases involving past wilful flouting of the court's authority"). The more plausible and defensible explanation for the trial court's punitive awards, however, is that they constitute an exercise of the court's civil contempt power, by which the court meant to coerce Grant to abide, in the future, by the order to deliver the three missing items to Patricia. *See L.A.M. v. State,* 547 P.2d 827, 832 (Alaska 1976) (attempt to coerce future conduct distinguishes civil contempt from criminal contempt, which punishes past conduct); *see also Continental Ins. Co. v. Bayless & Roberts, Inc.,* 548 P.2d 398, 405 (Alaska 1976) (elements of both punitive and remedial punishments are present in most civil contempt awards).

Such use of the civil contempt power in itself is not an abuse of discretion.[9] *See, e.g., Continental Ins. Co.,* 548 P.2d at 405. We agree with Grant, however, that the trial court's choice of an arbitrary $1,000 per item award constituted an improper exercise of the contempt power in this case. Alaska Statute 09.50.040 states that the

8. We respect the superior court's conclusion that Grant himself acted improperly during the period of his separation from Patricia. We note, however, that the trial court's power to consider one party's fault in marital property division cases is extremely limited. *See* AS 25.-24.160(b). On the other hand, we also note that a party's improper post-separation conduct, if specifically improper in respect to marital assets or debts, may be a relevant factor in determining a final, just division of the marital property. *Oberhansly v. Oberhansly,* 798 P.2d 883, 885 (Alaska 1990) (husband's willful mismanagement of marital assets during separation justified unequal division of property); *Hartland v. Hartland,* 777 P.2d 636, 642 (Alaska 1989) (same); *Moore v. Moore,* 499 P.2d 300, 303 & n.

3 (Alaska 1972) (in dividing marital property, court properly considered wife's appropriation of marital funds during separation); *see also Merrill,* 368 P.2d at 547 n. 4 (providing basis for decisions in *Oberhansly, Hartland* and *Moore*). Thus, upon remand, the trial court may consider, in its final property division determination, the extent to which Grant was at fault for any misappropriation of marital assets in the case.

9. Grant, of course, properly would have received a hearing to show cause why the court should not levy the contempt awards against him. Alaska R.Civ.P. 90(b). At such a hearing, the trial court could have considered further the question whether Grant properly could be held in contempt for not returning items allegedly misappropriated by Allan.

trial court may both punish for contempt *and* "give judgment in favor of the party aggrieved" in a damages amount "sufficient to indemnify that party and to satisfy the costs and disbursements of that party." The trial court here did not allocate any portion of its punitive award as a penalty payable to the court. Rather, all of the punitive award amounts were payable to Patricia, the "party aggrieved" within the meaning of AS 09.50.040. Moreover, we have interpreted AS 09.50.040 to mean that there must be a correlation between the aggrieved party's actual damages and costs and the amount assessed as damages. *Hartland v. Hartland*, 777 P.2d 636, 648 (Alaska 1989). On the present record, we find no correlation between Patricia's actual loss of three unique items and the three identical amounts that the court assessed against Grant. Thus, the trial court abused its discretion by imposing the specific award amounts payable to Patricia.

### III

Grant next challenges the trial court's child support award, arguing that the trial court erred both in its decision not to make the award retroactive to the date of separation and in its determination of the monthly amount Patricia must pay. We find Grant's first argument deficient for several reasons; we agree, however, with his second argument.

The question whether the trial court properly refused to make its child support award retroactive to the date of separation is more complex than Grant acknowledges. There are actually two time periods at issue. Initially, we note that Judge Hodges issued a temporary order in the case on May 10, 1989, in which he directed Grant to pay Patricia $400 per month. As Patricia's counsel later argued, Judge Hodges apparently considered many factors before deciding upon the temporary $400 per month award. Among those factors was Grant's

continuing support of Allan. Consequently, the trial court had sufficient reason to conclude that its child support award should not cover the period between May 10, 1989 and the date of dissolution.

■ As to the second period in issue— the time between the date of separation in July 1987 and the temporary order in May 1989—Grant's proper claim is in the nature of an action on a debt based on the parental duty to support a child. *Ogard*, 808 P.2d at 817 & n. 1; *Matthews v. Matthews*, 739 P.2d 1298, 1299 (Alaska 1987). Whether Grant deserves reimbursement from Patricia for any amount she, as a parent, owed for Allan's support during the separation period is an individual claim Grant did not raise below. Neither in his pretrial memorandum, nor at closing argument did Grant advance such a claim.[10] "It is well established that matters not raised at trial will not be considered on appeal." *Brooks v. Brooks*, 733 P.2d 1044, 1053 (Alaska 1987). As a result, we decline to consider Grant's argument that the trial court erred by not ordering reimbursement to him for his support of Allan from July 1987 to May 1989.

■ On the other hand, we agree with Grant's argument that the trial court erred in its calculation of a minimal award of $40 per month child support against Patricia. In its findings of fact and conclusions of law, the trial court stated that its award to Grant of child support for Allan was different than the amount Civil Rule 90.3 would normally require the court to award. *See* Alaska R.Civ.P. 90.3. The court explained:

> The reason for the departure ... is based on the earning power disparity of the parties. In addition, due to Allan's closeness to the age of majority and the fact that visitation was effectively thwarted because of the son's emotional state, the Court is greatly concerned about the role

10. When the trial court announced its child support decision, Grant's counsel inquired whether the court's award was retroactive to the date of separation. The court said that the award was not retroactive. That simple question-and-answer exchange, initiated *after* the court had determined a support award and with no reference to any prior argument in the case, was as close as Grant came to raising the question of a debt owed him based on the parental duty to support a child.

that [Allan] was permitted to play and did play as he was allowed to become personally involved in this divorce.

The dispositive question on review is whether any of the reasons listed above conform to the requirements of Civil Rule 90.3(c), which permits variance from the letter of Civil Rule 90.3 for "good cause upon proof by clear and convincing evidence that manifest injustice would result" without the variance. Alaska R.Civ.P. 90.-3(c)(1).

Civil Rule 90.3 includes examples of exceptional circumstances that might amount to "good cause." *See* Alaska R.Civ.P. 90.-3(c)(1). In this case, none of the trial court's stated reasons for varying from the formulae of Civil Rule 90.3 resemble any of those examples of "good cause" offered in the Rule. Of course, the examples in Civil Rule 90.3 are not exhaustive. *Coats v. Finn,* 779 P.2d 775, 777 (Alaska 1989). The meaning of the term "good cause," however, is to "be determined by the context in which it is used." *Id.* That context, for Civil Rule 90.3 purposes, *must* focus first and foremost on the needs of the children. *See* Civil Rule 90.3, commentary at sec. I(B). The trial court in this case showed no signs of such a focus. On the contrary, the court once again appears to have used its power improperly to punish Grant and Allan. As a result, the court did not vary from Civil Rule 90.3 in order to avoid the sort of "manifest injustice" that may justify a variance. We thus vacate and remand the support award for recalculation pursuant to Civil Rule 90.3.

### IV

 Finally, Grant argues that there was not a sufficient "disparity of earnings" between him and Patricia to support the trial court's award of $2,500 in partial attorney's fees to Patricia. We disagree.

The relevant considerations for determining attorney's fee awards in divorce cases are the relative economic situation and earning power of each party. *Hartland,* 777 P.2d at 644. If the parties are in "comparable economic situations, each side should bear [its] own costs." *Id.* If not, then an award of attorney's fees in a divorce case is within the discretion of the trial court. *Lone Wolf v. Lone Wolf,* 741 P.2d 1187, 1192 (Alaska 1987). Such an award "will not be disturbed on appeal unless it is 'arbitrary, capricious, manifestly unreasonable, or stems from an improper motive.'" *Id.* (quoting *Brooks v. Brooks,* 733 P.2d 1044, 1058 (Alaska 1987); *Tobeluk v. Lind,* 589 P.2d 873, 878 (Alaska 1979)).

Record evidence indicates that Grant's income at the time of the divorce decree, including his part of the retirement pension, was approximately $62,000 per year.[11] Evidence further indicates that Patricia's income, also including her part of the pension, was approximately $40,000 per year.[12] Additionally, Grant has a B.S. degree in civil engineering, extensive experience as an engineer, and current employment as an engineer. In contrast, Patricia has two A.A. degrees, one in liberal arts and one in dental hygiene. She has worked off and on since 1981 as a dental hygienist.

We find no abuse of discretion in the trial court's conclusion that Grant and Patricia were *not* in comparable economic situations. Both the actual earnings and earning powers of the parties are significantly disparate. We thus affirm the trial court's award of partial attorney's fees to Patricia.

The judgment is VACATED in part, AFFIRMED in part, and REMANDED to the superior court for proceedings consistent with this opinion.

---

**11.** Grant earned $50,404 in 1988. His share of his full disability pension and his part of the ordinary retirement pension after its division by the trial court amounted to approximately $11,-716 per year.

**12.** Patricia earned $34,200 in 1988. The trial court award of ½ of ¹⁹⁄₂₀ of Grant's ordinary pension equaled approximately $6,116 per year.