**HELEN S.K., Appellant,**

v.

**SAMUEL M.K., Appellee.**

No. S–14422.

Supreme Court of Alaska.

Nov. 16, 2012.

---

43. 36 P.3d 1196, 1199 (Alaska 2001).

44. *Id.; see also Sheehan,* 852 P.2d at 1181.

464

---

Robin A. Taylor, Law Office of Robin A. Taylor, Anchorage, for Appellant.

Maurice N. Ellis, Law Office of Maurice N. Ellis, Anchorage, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and STOWERS, Justices.

1. We have used pseudonyms throughout this opinion to protect the privacy of family members.

2. An in camera interview is an interview by the judge of a child in a custody case to ascertain the

*OPINION*

STOWERS, Justice.

## I. INTRODUCTION

Helen S.K. and Samuel M. K.[1] were married in 1990. Helen filed for divorce in December 2010, requesting sole legal and primary physical custody of the parties' three minor children and equitable division of the marital assets. Samuel counterclaimed, requesting joint legal and shared physical custody of the children. Superior Court Judge Frank A. Pfiffner awarded joint legal custody of all three children, shared physical custody of the parties' two younger children, but awarded Samuel primary physical custody of the parties' oldest child. The court imputed income to Helen and required that she pay Samuel child support. Judge Pfiffner divided the parties' marital assets equally and made other decisions concerning the valuation and distribution of certain marital assets. Helen appealed this decision on several grounds, including the use of in camera interviews,[2] the primary physical custody award to Samuel, the imputation of income, the equal property division, and the valuation and distribution of many of the assets. We reverse and remand with respect to the court's valuation of one asset, but affirm all of its other decisions.

## II. FACTS AND PROCEEDINGS

### A. Facts

#### 1. The family

Helen S.K. and Samuel M.K. were married in 1990. Helen filed for divorce in December 2010, requesting sole legal and primary physical custody of the parties' three minor children and equitable division of the marital assets. Samuel counterclaimed, requesting joint legal and shared physical custody of the children. The three minor children were, at the time of trial: Jason, aged 16; Ellen, aged 14; and Jacob, aged 12.

child's preference as to custody placement. *See* AS 25.24.150(c)(3) (providing that a child's preference is a best interest factor the court shall consider if the child is of sufficient age and maturity to form a preference).

Helen and her oldest son Jason had a contentious relationship. Helen described her son as an "instigator" with respect to the other two children, and believed that he had a "hard time getting along" with them. Samuel confirmed that Jason and Ellen often got "on each other's nerves," fought daily, and sometimes needed to be separated. During their in camera interviews, each of the children noted some conflict between Helen and Jason.

This situation was made more complicated because Helen believed that Jason should continue medication for his diagnosed attention deficit disorder (ADD), while Samuel and Jason himself did not believe Jason should do so. At one point, Samuel took Jason to the doctor and had Jason removed from the medication without Helen's prior knowledge.

### 2. The court's interviews with the children

At the end of the hearing on interim custody, Samuel asked the court to interview the children prior to trial. Helen objected to judicial interviews with the children. Helen argued that the children had already been over-involved in decision-making and that placing this responsibility on them would be "unhealthy." She instead requested the appointment of a custody investigator because she felt that asking the children to talk to a judge was "a heavy burden to put on a kid in a highly contentious situation."

At the conclusion of the interim custody hearing, Judge Pfiffner explained:

These children are over the age of 12. I'm required statutorily under one of the factors under AS 25.24.150(c) to take into account the children's interests because of their age in what ultimately happens here. Yes it is a stressful thing, but I somehow ... [have] to figure out what the kids want, [but] ... I'm not bound to follow what they want. I'm required to make a statutory determination of their best interests using ... all of the nine factors cited under the statute that I just mentioned. . . .

I certainly want to take their interests into account. One of the ways I put it is that

the children, they are still children and they don't drive the bus. . . . [O]n the other hand ... it's their lives that we're talking about here. . . .

After Helen objected to the in camera interview and again requested a custody investigator, the court responded:

I am going to interview them. I'm not going to appoint the custody investigator. . . .

I'll explain to you the way I do interviews. I do them in a non-threatening environment in my chambers on the record. The record is confidential. Actually, it's ... sealed, not confidential, which means that unless I order otherwise, it's recorded on the record, but not available to anybody.

I have an in-court deputy in there in my chambers with them. And frankly, it's worked. I used to not do very many of these at all, but over time, I've started doing more of them, because frankly, it's worked pretty well.

I don't want to put ... the children on the [witness] stand [to testify in court]. You know, that would be horrible here, and that's not going to happen. And because of the exigencies of time, I'm not going to utilize the custody investigator's office, which ... may or may not be able to do this the way that I'm doing it. So we'll ensure that happens. . . .

And basically, I'll ... give you at the start of the trial some kind of perspective on where the children are coming from.

After the in camera interviews and before trial, Judge Pfiffner provided the parties with a summary of what he learned from the children:

[Ellen and Jacob] want to be together, and they like the new one week on/one week off schedule. If I were to do what they want—of course, I'm not obligated to do, and that remains for a decision—it would be one week on/one week off. They like the new regime, and they want it to continue indefinitely. That's my take.

[Jason] is a bit of a different situation. I think somebody described Jason as kind of a handful or—I'm not sure exactly what

[Jason] wants. I was not able to really pin him down like you would put a pin on a dartboard....

But I will tell you this. It's clear to me from talking to [Jason], and really from talking to all three children, that [Jason] and Mom don't get along, and [Jason] really doesn't want to spend much time at all with Mom.

And what ... [Jason] told me really was consistent with what the other children perceived, as well. So ... it's not that [Jason] is out there on the edge of the cliff somewhere....

As to [Jason], he clearly wants primary physical custody with his father.

The squishy part, if you will, the part that I wasn't really able to pin him down on was how much time he wanted to spend with Mom. And he clearly wanted to spend time with Mom....

[H]e was really not definitive on exactly what he wanted there. But he certainly wanted one weekend a month, and maybe a little bit more, but not much.

And he wanted a couple of nights, like 5 to 8 [p.m.], a month with Mom. And that was kind of squishy, too, because he was very definitive that he was going to be involved in some sports, like soccer, and he didn't want the visitation with Mom to interfere with his extracurricular activities.

Later during trial, the court reiterated, "I understand what [Jason] wants[, but] ... [w]hat Dad has to show me is that ... [it's] in [Jason's] best interest, i.e., that he can meet [Jason's] needs given his vigorous work schedule." Conversely, Helen would need to show that "more of a shared arrangement is better for [Jason], even though [Jason] clearly does not want that."

#### a. Interview with Jason

The court began the interview with Jason by explaining:

This is a confidential, sealed interview that is available only to the [c]ourt, unless I order otherwise. So it is confidential.

So it's a chance for me to talk to you, [Jason], about your situation, your interests, your desires relative to the ongoing case. Because eventually ... I have to make a decision on final custody involving ... where you live, with Mom or Dad, or split in some way, that sort of thing, okay?

In his interview, Jason expressed a preference for living with his father and living with both of his siblings. Jason felt that his father was in a better position to help him with his homework and shared more of the same hobbies and interests. Jason still wanted to spend some time with his mother, agreeing to "an occasional weekend" and "maybe off and on during the week," so long as his sports schedules were not impacted.

Regarding ADD medication, Jason explained that it is easier for him to do his homework now that he was not taking his medication, and that the medication made him feel "sick" and "lethargic." Jason also said that he agreed with his doctor that he had "grown out" of his ADD and no longer needed the medication.

#### b. Interview with Ellen

The court began the interview with Ellen by explaining:

This recording is confidential. That means that it's available to the [c]ourt and court staff, but not to your parents or their lawyers without any further order of the [c]ourt.

I requested that I talk to each child, since the children are 12 or older or thereabouts with the youngest. And that I wanted to get their input on what's going on in their lives and what they would like to have or prefer to have happen, in terms of custody. I want to have them have a voice, and I figured this was the best way to do it.

Ellen expressed a preference to continue the weekly alternating schedules. She also explained that her brother Jason is "really annoying, because he stopped taking his ADD medications," but also "since [he has] ADD, he doesn't realize ... [his] jokes aren't exactly funny ... [h]e did have medication, but it didn't do anything." Ellen expressed her belief that Jason and Helen "don't get along" and that Jason and Samuel get along "really well."

#### c. Interview with Jacob

The court began the interview with Jacob by explaining:

This is a confidential recording available only to the [c]ourt, unless I order otherwise, where I'm talking to each of the [K.] children, in this case the youngest, [Jacob], about the custody situation and their parents' divorce.

When children are 12 or older, and you're 12, so you get to tell me anything you'd really like to tell me. And I'll ask some questions. But really, what we're here about is to find out what your interests and desires are with regard to how you'd like custody and visitation to work with your parents' ongoing divorce....

And I'm required under the law to—because of your age, to take into account what your interests and preferences are. I'm not required to do what you want me to do, but I'm required to take it into account in making a determination of what is in the best interests of each of the children for ultimately determining custody, okay?

Jacob wanted the schedule to remain "even" with alternating weeks with each parent, and all the siblings to stay together. Jacob also reported that Jason and Helen "fight sometimes" and "sometimes" yell at each other. Jacob said that Helen does not yell at him (Jacob) as often.

#### 3. Helen's income

Helen works as a sonographer and is at the top of her pay scale. She works approximately 32 hours per week and makes $63,000 per year. Helen began working this reduced work schedule when the children were young in order to spend more time at home and cut down on child care costs. Helen testified that now that the children are older, she wanted to continue working a reduced schedule both to be available for the children and to reduce the risk of repetitive use injuries

---

**3.** Capital stock is the "total number of shares of a stock that a corporation may issue under its charter or articles of incorporation." BLACK'S LAW DICTIONARY. 1551 (9th ed.2009). The corporation initially and periodically thereafter declares the "total par value or stated value of this stock."

that can result from working as a sonographer. Helen argued that she hoped to add about four hours a week to her work schedule each week during which Samuel has the children.

Kurt Jacobson, a supervisor in Helen's department, testified that Helen was the clinic's only sonographer and that the clinic's needs were met by Helen's 32-hours-per-week schedule. He also testified that although Helen leaves work at about 3:30 p.m., the clinic has physicians until 5:30 p.m. and sometimes the clinic must turn away patients or hire someone to fill in for Helen when she is on vacation or taking a day off, which implies the clinic could serve additional patients if Helen worked full time. Jacobson testified to his belief that the clinic could provide Helen with an additional eight hours per week if she wanted to work full time.

Jacobson also testified that Helen had complained of an aching wrist but acknowledged that she never filed a worker's compensation claim in response to those complaints. He testified that "it is documented that sonographers do have a problem with their wrist.... Repetitive motion syndrome is a common injury to people that use their hands...." Helen testified about experiencing wrist pain and the frequency of pain experienced by sonographers.

#### 4. Samuel's capital stock

Samuel works as a civil engineer for USKH, Inc. and owns 200 shares of USKH capital stock.[3] The vice president of USKH, Lance Mearig, testified regarding the value and transferability of Samuel's shares. The company last valued the shares on August 16, 2010, at $1,033.38 per share. At this valuation, Samuel's shares would be worth $206,676. However, the shares were set to be re-valued on August 9, 2011, and a drop in value was expected. At the time of his testimony, July 6, 2011, Mearig valued the shares at $638.40 per share, testified that Samuel

---

*See id.* As in this case, capital stock is not traded on the market, and the market does not establish the stock's value. Depending on the corporation's articles or bylaws, capital stock may be purchased by other shareholders or the corporation. *See* AS 10.06.325.

had 200 shares, and set the value of Samuel's shares at $127,680.[4]

According to Mearig, if Samuel wanted to sell his shares, he would need the approval of each shareholder; then the company would have right of first refusal; and then, if USKH declined to buy back the shares, Samuel could try to sell the shares to another shareholder. If that process were not successful the sale would not happen, because the company stock is not transferable to non-shareholders. If the court were to order a sale of the stock in spite of these difficulties, the corporation would buy the shares at $0.25 on the dollar. However, Mearig testified that as recently as June 21, 2011, USKH bought back another shareholder's 200 shares at $1,033 per share.[5]

### 5. Marital property

The parties' boat, household furnishings, exercise equipment, guns, and a second washer, dryer, and refrigerator are at issue in this appeal.

#### a. Boat

Helen listed the parties' boat as having a value of $1,500, although she said at trial this must have been a typo and instead estimated the value of the boat to be $15,000 after looking at boats on Craigslist. Samuel at first listed the value of the boat at $8,000, but then in his trial brief listed the value at $7,500. At trial Samuel testified that his parents had given him the boat in 2006, and had paid $12,000 for the boat in 1989. The court found Samuel's estimate of the boat's value to be more accurate because Helen's "estimate was based on a price comparison with boats that were of higher quality and otherwise not comparable in value." The court also found that "although the boat was a gift from Mr. [K.]'s parents, it was transmuted into a marital asset."

#### b. Household furnishings

Samuel testified that the household furnishings, such as beds, tables, chairs, etc., were worth $7,500. Helen believed the furnishings were worth $1,500 because most of them were secondhand or generally worn down. The court valued the furniture at $7,500 and divided the furniture as Samuel requested.

#### c. Exercise equipment

The parties agreed that Helen would keep the elliptical and Samuel would keep the treadmill. After looking online, Helen set the value of the elliptical at $200 and the value of the treadmill at $300. She also testified that the machines were purchased for "over a thousand each" about four or five years prior. Samuel listed the combined value of the two machines as $1,200. The court adopted Samuel's valuation and awarded the elliptical to Helen and the treadmill to Samuel.

#### d. Guns

There are three guns at issue on appeal: (1) a 12–gauge shotgun; (2) a .30–06 rifle with scope; and (3) a .45 pistol. Samuel testified to having owned the shotgun since high school; he valued it at $300. Helen valued the shotgun at $400. The court found this to be Samuel's premarital asset and therefore not subject to division. Samuel testified to having owned the .30–06 since high school and valued it at $350; Helen valued it at $550. The court found this gun to be Samuel's premarital property. Samuel valued the .45 at $350; Helen valued it at $850. The court valued the gun at $350 and awarded it to Samuel.

#### e. Second washer, dryer, and refrigerator

Helen listed the value of a second washer/dryer set as $100 and wanted Samuel to take it. Samuel did not want the set. The

---

4. Mearig also testified that at the planned August 2011 board of directors meeting there might be a decrease in the total number of outstanding shares due to a shareholder departure, so Mearig's valuation of Samuel's shares could increase to $696.35 per share, or $139,271 total.

5. The shares were bought over time as per the buyback agreement.

court ordered that the set would stay with the home, which the parties agreed would be awarded to Helen.

Similarly, Helen listed the value of a second refrigerator at $100 and wanted Samuel to take it. Samuel did not want the second refrigerator. The court ordered that the second refrigerator also stay with the home.

## B. Proceedings

Before the divorce trial took place, Helen and Samuel participated in an interim custody hearing on May 31, 2011. After the hearing but before trial, the court interviewed all three children in camera regarding their custody preferences. These interviews took place from June 13–15, 2011. The trial itself was held over several days in the summer of 2011: June 21, July 6–8, July 11, and July 19.

The court determined that the parties would exercise joint legal custody of all three children and shared physical custody of Ellen and Jacob. Samuel would have primary physical custody of Jason, with Helen to receive visitation. The court found the custody decision to be "in the best interests of the parties' three children." Because Samuel was awarded primary physical custody of Jason, Helen would owe child support to Samuel, which the court ordered should be calculated based on Helen's imputed income, as if she were working 40 hours per week, even though Helen's schedule called for only 30–32 hours per week at the time of trial. Samuel was given the responsibility to file for and manage the children's Alaska Permanent Fund Dividends (PFDs).

The court equally divided the property. The marital home was awarded to Helen, while the marital cabin was awarded to Samuel. As to the disputed assets, the court found: (1) Samuel's capital stock had a current fair market value of $133,475.49, which was below the value for which Helen had

argued;[6] (2) the fishing boat was marital property, not Samuel's separate property, and was valued at $7,500, the value which Samuel had suggested; (3) the shotgun and .30–06 were Samuel's premarital property, while the .45 pistol was marital property and worth $350, as suggested by Samuel; it was awarded to Samuel; (4) Samuel's valuation and proposed division of furnishings was acceptable and adopted; (5) Helen's valuation of the artwork was acceptable; and (6) a disputed generator should stay with the cabin and therefore was awarded to Samuel. The court also ordered that Helen "shall retain her married name."

## III. STANDARD OF REVIEW

Because "[t]he superior court has broad discretion in deciding child custody issues," we will not reverse the superior court's custody decision unless the court "abused its discretion or the controlling factual findings are clearly erroneous."[7] "Abuse of discretion is established if the trial court considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others."[8] We have held that

> in making a final child custody determination, a trial court need not specifically address the statutory factors detailed in AS 25.24.150(c), and make explicit ultimate findings that the best interests of the children require the custodial disposition reached, so long as its findings either give us a clear indication of the factors which the superior court considered important in exercising its discretion or allow us to glean from the record what considerations were involved.[9]

We "review for abuse of discretion the weight given by the superior court to the factors in AS 25.24.150(c) for determining the best interest of a child."[10] We will not dis-

---

6. The court's valuation of $133,475.49 was the average of Mearig's two proffered values. See supra note 4 and accompanying text.

7. Iverson v. Griffith, 180 P.3d 943, 945 (Alaska 2008).

8. Smith v. Weekley, 73 P.3d 1219, 1222 (Alaska 2003) (internal citations and quotation marks omitted).

9. Id. at 1226 (internal citations and quotation marks omitted).

10. Barlow v. Thompson, 221 P.3d 998, 1001 (Alaska 2009).

turb decisions under the abuse of discretion standard unless the results are "clearly unjust." [11]

■ "A factual finding is clearly erroneous when a review of the record leaves [us] with a definite and firm conviction that the superior court has made a mistake." [12] "The trial court's factual findings enjoy particular deference when they are based primarily on oral testimony, because the trial court, not this court, judges the credibility of witnesses and weighs conflicting evidence." [13]

■ We review constitutional questions, like whether there has been a due process violation, de novo.[14]

■ We review the superior court's decision to impute income for abuse of discretion.[15] The superior court's "determination of an obligor's imputed income is a factual finding that we review for clear error." [16]

■ We review the superior court's property division for abuse of discretion; the division will not be disturbed "unless it is clearly unjust." [17] "The trial court's determination of which date to use for purposes of valuing property is reviewed for an abuse of discretion." [18] "The valuation of available property is a factual determination that should be reversed only if clearly erroneous." [19]

## IV. DISCUSSION

### A. The Superior Court Did Not Err When Making Its Custody Decisions.

### 1. The superior court did not err by conducting in camera interviews of the children over Helen's objections.

■ Helen argues that the superior court violated her right to due process—specifically her right to know the evidence used against her at trial—when it conducted in camera interviews with the children. She contends that the court relied on information obtained from these ex parte interviews, but did not provide the transcripts of the interviews to the parties for their use at trial. This is an issue of first impression in Alaska. We hold that the superior court has discretion to interview children in camera, and that the in camera interviews in this case did not violate Helen's due process rights. Our decision balances two competing interests: the due process rights of the parents to know and respond to evidence used at trial, and the privacy and best interests of the children.

■ We begin by emphasizing that in camera interviews should be used rarely, and only when truly necessary, because the in camera process creates a risk of infringing the due process rights of the parents.[20] But we acknowledge there are many valid reasons to avoid allowing the children to become witnesses and questioned in open court, not

11. *Cartee v. Cartee*, 239 P.3d 707, 712 (Alaska 2010).

12. *Fardig v. Fardig*, 56 P.3d 9, 11 (Alaska 2002) (internal citations and quotation marks omitted).

13. *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011) (internal citations and quotations marks omitted).

14. *James v. State, Dep't of Corr.*, 260 P.3d 1046, 1050 (Alaska 2011).

15. *O'Connell v. Christenson*, 75 P.3d 1037, 1039 (Alaska 2003).

16. *Sawicki v. Haxby*, 186 P.3d 546, 550 (Alaska 2008).

17. *Cartee v. Cartee*, 239 P.3d 707, 712 (Alaska 2010).

18. *Stevens v. Stevens*, 265 P.3d 279, 284 (Alaska 2011).

19. *Id.*

20. *See In re H.R.C.*, 286 Mich.App. 444, 781 N.W.2d 105, 112 (2009) ("While questioning in an in camera interview does not constitute a due process violation as long as the interview is limited to the child's parental preferences, it is not difficult to see how the use of an in camera interview for fact-finding presents multiple due process problems: Should questions or answers arise concerning disputed facts unrelated to the child's preference, there is no opportunity for the opposing party to cross-examine or impeach the witness, or to present contradictory evidence; nor is there created an appellate record that would permit a party to challenge the evidence underlying a court's decision.") (internal citations omitted).

least of which is the harm the child might suffer upon being forced to participate in a public adversarial proceeding involving his or her own parents.[21] The guidelines we issue today are intended to assist the trial courts in considering the need to balance the due process rights of the parents with the best interests of the children. Every case is unique and must be considered on a case-by-case basis. Because the decision to conduct in camera interviews is a discretionary decision, we review that decision for abuse of discretion.[22]

▮▮▮▮ We first observe that if a judge does not feel well equipped or suited to undertake the task of conducting in camera interviews with children, or prefers not to conduct such interviews, then the judge should seek the assistance of a custody investigator or a fellow judge. More substantively, it is widely understood, and we agree, that as long as the parties are given a summary of the information provided in the in camera interview and to be relied on at trial, the court may conduct the interview outside the presence of the parties and their counsel.[23] However, it is important that the court limit the interview to the issue of the child's parental preference.[24] In camera interviews

are not to be used as a method of obtaining additional information on other issues in the custody proceeding. If a child happens to volunteer such information, the interview is still valid provided that, if the court intends to rely on such information, the parties are informed in a manner that enables them to adequately respond to that information.

▮▮▮▮ Procedurally, interviews should be conducted before trial unless the trial court expresses a principled reason to hold an interview at another time. The interview should take place in a quiet, private area, such as judicial chambers or a jury room. The interview must be recorded, but it can be sealed. The judge should take care to explain to all parties involved, including the children, when the transcript of the interviews will become available for review by the parents and their attorneys, and what information will be shared with the parties.[25] Parents can recommend questions for the judge to ask, but the judge need not follow such recommendations. And finally, best practices suggest that a judicial assistant, law clerk, or other appropriate court employee should be present during the interview, but need not be if there is a compelling reason to the contrary.

---

**21.** *See Ynclan v. Woodward*, 237 P.3d 145, 150–51 (Okla.2010).

**22.** *See Lesauskis v. Lesauskis*, 111 Mich.App. 811, 314 N.W.2d 767, 768–69 (1981).

**23.** *Id.* ("[T]his Court has repeatedly suggested that a child of tender years express his preference during a private conference with the judge.... [T]here is no authority which removes the matter from the sound discretion of the trial court.... The scope of the conference is limited to determining the child's preference only and does not include discussion of other factors germane to the custody dispute.... Consequently, the utility of the presence of counsel is slight, especially when weighed against the child's probable reaction to the foreboding presence of the mother's or father's lawyer.") (internal citations omitted); *Uherek v. Sathe*, 391 N.J.Super. 164, 917 A.2d 306, 308 (N.J.Super.A.D.2007) ("The divulging of information ascertained from the in camera interview, when relied upon by the judge in rendering a decision, is required by due process principles."); *In re Whitaker*, 36 Ohio St.3d 213, 522 N.E.2d 563, 568–69 (1988) ("We do not believe that it is a denial of due process for the court to interview the child in camera, even over the objection of a party. This is especially true

where the only inquiry is into the child's custodial or visitation preference, where the court informs the parties of the contents of the interview, or where the attorneys are present during the interview."); *Brown v. Burch*, 30 Va.App. 670, 519 S.E.2d 403, 408 (1999) ("[W]e recognized that a parent must be accorded the benefits of due process in a custody dispute.... [but] in any child custody decision, the lodestar for the court is the best interest of the child, and the due process rights of the parents must be tempered by this guiding principle.") (internal citations and quotation marks omitted);

**24.** *H.R.C.*, 781 N.W.2d at 112.

**25.** The superior court in this case advised the children that the recording would be confidential and not provided to their parents without a further order of the court. The court did not advise them it would provide a summary of their statements to the parents. Though no harm was caused by this omission in this case, trial courts should understand that the children's trust and respect for the court could be irreparably harmed if they perceive that the court broke promises made to them not to reveal anything from their interviews.

■ Here, the court conducted in camera interviews with the three children in chambers. It recorded the conversations and then summarized for the parties the information it obtained and intended to rely on. Helen argues that, had she known Jason alleged that Samuel was better able to help him with his homework and shared more interests in common with him, she would have been able to respond directly to those issues at trial. Helen is correct that such information arguably relates to factors outside the scope of AS 25.24.150(c)(3), but this information also is relevant to Jason's reasons why he had a preference to be in his father's custody. The use of such information from an interview does not render the interview invalid.

In sum, the superior court adequately complied with the general guidelines we have set forth today. The parents' due process rights were observed by the summary of information from the interviews provided by the court. The court did not abuse its discretion in deciding to conduct in camera interviews and in the way it conducted the interviews.

**2. The superior court did not fail to consider all relevant AS 25.24.150 factors or otherwise abuse its discretion in its custody decision with respect to Jason, the oldest child.**

Alaska Statute 25.24.150(c) mandates that "[t]he court shall determine custody in accordance with the best interests of the child," and that "[i]n determining the best interests of the child the court shall consider":

(1) the physical, emotional, mental, religious, and social needs of the child;

(2) the capability and desire of each parent to meet these needs;

(3) the child's preference if the child is of sufficient age and capacity to form a preference;

(4) the love and affection existing between the child and each parent;

(5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;

(6) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, except that the court may not consider this willingness and ability if one parent shows that the other parent has sexually assaulted or engaged in domestic violence against the parent or a child, and that a continuing relationship with the other parent will endanger the health or safety of either the parent or the child;

(7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;

(8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;

(9) other factors that the court considers pertinent.

■ Helen argues that the court considered only AS 25.24.150(c)(3)—the child's preference—when awarding primary physical custody of Jason to Samuel. She also argues that the court did not adequately consider Jason's special needs when awarding custody, and that the court's visitation schedule was too restrictive. Helen is correct that the superior court's written custody decision was rather brief and focused on AS 25.24.150(c)(3).[26] But when "determining the best interests of a child, the court need not discuss each statutory factor in detail; the court's findings will be sufficient if they 'give us a clear indication of the factors which [the court] considered important in exercising its discretion or allow us to glean from the record what considerations were involved.'"[27]

**26.** The court devoted about a half page of text to a discussion of the children's preferences and then wrote: "Pursuant to all of the factors set forth in AS 25.24.150(c), and for all of the reasons stated on the electronic record, the court finds.... Mr. [K.] is awarded primary physical custody of [Jason]...."

**27.** *Ebertz v. Ebertz,* 113 P.3d 643, 648 (Alaska 2005) (quoting *Smith v. Weekley,* 73 P.3d 1219, 1225 (Alaska 2003)).

Further, as Samuel notes, in addition to considering the children's preferences, "Judge Pfiffner also based his final custody decision on the findings he had made on the record just five weeks prior to trial at the conclusion of the extensive five and a half hour custody hearing held on May 31, 2011." At the end of the interim custody hearing, the court found both parties to be "good people" and "good parents," and that "while there have been some allegations of emotional and physical abuse and alcohol and drugs ... there is really nothing that I find at this point in time that substantiates any of that." At the beginning of the divorce proceedings in July, the court explained: "My mind is completely open to hear the evidence.... Under the statute, I'm required to take into account the children's preferences because of their age. I'm certainly not required to do what the children want, and I'll do what I think is in the best interests of the children after I hear all of the evidence."

■ There is evidence in the record that the children's stability[28] would be aided by Jason's placement with Samuel: The parties agreed that the relationship between Jason and his mother was contentious, and implicit in the court's decision is that the stability factor favored Samuel. The court found no substantiated evidence of drug or alcohol abuse or domestic violence.[29] The court implicitly considered the capacity of each parent to meet the children's needs[30] and the love and affection existing between each parent and the children[31] by finding both parties to be good parents. Finally, the court was not sufficiently concerned by Jason's ADD and his having been taken off medications to expand further, and in the absence of substantial evidence from Helen that taking Jason off his medications was actually harmful to him, that decision was within the court's discretion.

■ Helen also argues that the superior court erred when it scheduled Jason's "severely restricted" visitation. Jason's scheduled visitation with his mother is indeed lim-ited, but the above-discussed facts show that the superior court considered Jason's preferences and best interests when awarding visitation. As the court explained:

[Jason] is a bit of a different situation. I think somebody described [Jason] as kind of a handful or—I'm not sure exactly what [Jason] wants. I was not able to really pin him down like you would put a pin on a dartboard....

The squishy part, if you will, the part that I wasn't really able to pin him down on was how much time he wanted to spend with Mom. And he clearly wanted to spend time with Mom....

[H]e was really not definitive on exactly what he wanted there. But he certainly wanted one weekend a month, and maybe a little bit more, but not much.

And he wanted a couple of nights, like 5 to 8 [p.m.], a month with Mom. And that was kind of squishy, too, because he was very definitive that he was going to be involved in some sports, like soccer, and he didn't want the visitation with Mom to interfere with his extracurricular activities.

Based on this information, the court awarded Helen one weekend a month with Jason and two evenings per month, in addition to alternating holidays and vacations. Jason was 16 years old at the time of trial, and this can be a very important consideration: If a court were to order more visitation with an older teenager who has expressed reservations about that visitation, that order could actually prompt more friction between the parents, and between the parent and child. We cannot say that the court's visitation order was an abuse of discretion.

In sum, the record does not indicate that the superior court failed to consider the relevant AS 25.24.150(c) factors or other relevant evidence when making its custody or visitation determinations. The superior court did not abuse its discretion in its custody decisions.

**28.** AS 25.24.150(c)(5).

**29.** AS 25.24.150(c)(7).

**30.** AS 25.24.150(c)(2).

**31.** AS 25.24.150(c)(4).

3. **The superior court did not abuse its discretion when it assigned Samuel the right to apply for and manage the children's PFDs.**

 While there was conflicting testimony on this matter, nothing in that testimony indicates that the superior court abused its discretion when assigning Samuel the right to manage the children's PFDs. Samuel testified that he would like to be in charge of filing the children's yearly PFD applications. Helen testified: "Typically I would have [Samuel] do it. I have done it for the last couple of years, though." Helen also testified that Jason's PFD was used for a ski pass that Helen thought was too expensive, and that in general she would rather be responsible for the PFD applications because "stuff doesn't always get done" when Samuel is responsible for it. While the parties' testimony was conflicting, it was for the superior court to decide which parent would better serve the children's best interests in being responsible for PFD applications. We hold the court's decision was not an abuse of its discretion.

B. **With One Exception, The Superior Court Did Not Abuse Its Discretion When Making Its Property Division.**

1. **The superior court did not err when it imputed income to Helen.**

We review the superior court's decision to impute income for abuse of discretion.[32] We will not disturb decisions under the abuse of discretion standard unless the results are "clearly unjust."[33] The superior court's "determination of an obligor's imputed income is a factual finding that we review for clear error."[34] "A factual finding is clearly erroneous when a review of the record leaves [us] with a definite and firm conviction that the superior court has made a mistake."[35]

In *Beaudoin v. Beaudoin*, in discussing imputed income, we explained that the objective of Civil Rule 90.3(a)(4)[36] is to "give courts broad discretion to impute income based on realistic estimates of earning potential in cases of voluntary and unreasonable unemployment or underemployment.... In our view, the boundaries of Alaska's rule are best left to be defined through case-by-case consideration based on the totality of relevant circumstances."[37]

 In its findings of fact the court explained its decision to impute income to Helen:

> The evidence presented showed that during the marriage and since, Ms. [K.][h]as chosen to limit the amount of hours she works each week to 30 to 32 hours per week. In this regard, the court finds that Ms. [K.]'s decision to limit her hours to 30 to 32 per week was the byproduct of an agreement between the parties during the marriage allowing her to work fewer hours in order to care for the children. In light of the divorce, however, this agreement no longer exists and Ms. [K.] will likely need to work a full 40 hour work week in order to meet her needs and her duty of support to the children. At trial, Ms. [K.]'s supervisor, Kurt Jacobson, testified that Ms. [K.] could work 40 hours per week if she wanted to. In light of this testimony, the court finds that there is nothing stopping Ms. [K.] from working full time other than

32. *O'Connell v. Christenson*, 75 P.3d 1037, 1039 (Alaska 2003).

33. *Cartee v. Cartee*, 239 P.3d 707, 712 (Alaska 2010).

34. *Sawicki v. Haxby*, 186 P.3d 546, 550 (Alaska 2008).

35. *Fardig v. Fardig*, 56 P.3d 9, 11 (Alaska 2002) (internal citations and quotation marks omitted).

36. Alaska Rule of Civil Procedure 90.3(a)(4) provides:
 > Potential Income. The court may calculate child support based on a determination of the potential income of a parent who voluntarily and unreasonably is unemployed or underemployed. A determination of potential income may not be made for a parent who is physically or mentally incapacitated, or who is caring for a child under two years of age to whom the parents owe a joint legal responsibility. Potential income will be based upon the parent's work history, qualifications, and job opportunities. The court also may impute potential income for non-income or low income producing assets.

37. 24 P.3d 523, 530–31 (Alaska 2001) (emphasis omitted).

her desire to continue working only part time.

Helen argues that she should be allowed to continue her reduced work schedule in order to be available for the children and to reduce the risk of repetitive use injuries that can result from working as a sonographer. She argues that her current income is sufficient, and that her employer does not need her to assume more hours. Samuel counters by emphasizing both the superior court's discretion in the matter and the testimony of Helen's boss suggesting that more hours would be available to her if she requested them.

In making its decision, the superior court relied on Helen's supervisor's belief that "there [is] work available to give [Helen] an extra eight hours a week." The court acknowledged that when they were married Helen and Samuel had made the decision that Helen would work fewer hours so that she could devote more time to the parties' children. The court explained, however, that "this agreement no longer exists" in light of the parties' divorce. The court further reasoned that "[t]here was no evidence presented" to show that Helen had a legitimate reason under Alaska Civil Rule 90.3 for underemployment. This is an issue left to the superior court's sound discretion, and we hold the court's decision was not an abuse of its discretion.

### 2. The superior court did not abuse its discretion when it ordered the marital assets to be split equally.

■ Under AS 25.24.160(a)(4), "the division of property must fairly allocate the economic effect of divorce by being based on consideration of the following factors":

(A) the length of the marriage and station in life of the parties during the marriage;

(B) the age and health of the parties;

(C) the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job mar-

ket, and custodial responsibilities for children during the marriage;

(D) the financial condition of the parties, including the availability and cost of health insurance;

(E) the conduct of the parties, including whether there has been unreasonable depletion of marital assets;

(F) the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physical custody of children;

(G) the circumstances and necessities of each party;

(H) the time and manner of acquisition of the property in question; and

(I) the income-producing capacity of the property and the value of the property at the time of division.

"An equal division of marital property is presumptively just,"[38] and on appeal "this court will only disturb a property division if it is clearly unjust."[39]

Helen argues that the length of the marriage, her lesser earning capacity, and her health concerns render the superior court's equal property division an abuse of discretion. She does not, however, engage with the presumption that an equal division of marital property is equitable, but only claims that the superior court's decision was rendered "without significant explanation."

■ The superior court acknowledged the "factors and considerations set forth in AS 25.24.160" and discussed several of those factors in its findings of fact. The court noted, for example, that (1) "both parties are gainfully employed," (2) "both parties have excellent benefits available to them through their employers," (3) "[b]oth parties are in reasonably good health," (4) Helen is six years younger than Samuel and therefore "has a longer work expectancy ... to recover from the economic effects of this divorce," and (5) "[b]oth parties are leaving the mar-

---

**38.** *Berry v. Berry*, 978 P.2d 93, 96 (Alaska 1999); *see also Brown v. Brown*, 914 P.2d 206, 209 (Alaska 1996); *Hayes v. Hayes*, 756 P.2d 298, 300 (Alaska 1988); *Wanberg v. Wanberg*, 664 P.2d 568, 574–75 (Alaska 1983).

**39.** *Brown*, 914 P.2d at 208–09.

riage with significant assets and very little consumer debt."

On appeal Helen characterized her case as "a long term marriage with [Samuel] having much greater income potential and [Helen] having health challenges." But the superior court specifically found that both parties were in "reasonably good health" and should be able to continue working in the future. The court also found both parties to be "gainfully employed" and noted that if Helen chose to work 40 hours per week, then her income would be very near that of Samuel's. And while the court did not specifically consider the length of the parties' marriage, "the trial court need not make findings pertaining to each factor," so long as its findings are "sufficient to indicate the factual basis for the conclusion reached." [40] We perceive neither clear error nor an abuse of discretion with the superior court's property division.[41]

### 3. It was error not to value Samuel's capital stock as of the date of trial.

■ Both parties acknowledge that the date of valuation of property should be as close as practicable to the date of trial.[42] They disagree, however, as to the value of the capital stock at the time of trial. "The valuation of available property is a factual determination that should be reversed only if clearly erroneous." [43]

As explained above, Samuel's company last valued its capital shares on August 16, 2010, at $1,033.38 per share. At this valuation, Samuel's 200 shares would be worth $206,676. The shares were set to be revalued after the trial, no later than August 9, 2011, with a drop in value expected. At the time of trial, July 6, 2011, Mearig valued the shares at $638.40 per share, and because Samuel had 200 shares, he set the value of Samuel's shares at $127,680. But Mearig

also testified that as recently as June 21, 2011, USKH had bought back another shareholder's 200 shares at $1,033 per share, for a total value of $206,600.[44]

The superior court found that the fair market value of Samuel's capital stock was $133,475.49, or $677.38 per share. In so finding, it relied on the presumption that fair market value is "the amount at which property would change hands, between a willing buyer and a willing seller." [45] The court believed that, due to the expected drop in value of the shares, "no reasonable buyer would pay more than $133,475.49 for the shares at this time."

■ We conclude that it was clear error for the court to rely on a possible but uncertain future stock valuation when very recent evidence of the stock's actual value was available: Approximately two weeks before trial, the company purchased another shareholder's capital stock for $206,600, at $1,033 per share. This was essentially contemporaneous evidence of the validity of the existing share price in Samuel's stock agreement with USKH and the actual value of Samuel's capital stock. The superior court's valuation is reversed and the property division is remanded for the court to adjust the property division to achieve an equal distribution in light of Samuel's capital stock's proper value.

### 4. The superior court did not err in its valuation and distribution of the couple's marital property.

Helen appeals the valuation and allocation of the parties' boat, household furnishings, exercise equipment, guns, and second washer, dryer, and refrigerator. She argues the court demonstrated a pattern of valuing the property by adopting Samuel's values. She also argues that the individual valuations were themselves clearly erroneous.

**40.** *Young v. Lowery,* 221 P.3d 1006, 1014 (Alaska 2009) (internal citation and quotation marks omitted).

**41.** *Fardig v. Fardig,* 56 P.3d 9, 11 (Alaska 2002).

**42.** *Ramsey v. Ramsey,* 834 P.2d 807, 809 (Alaska 1992); *Ogard v. Ogard,* 808 P.2d 815, 819 (Alaska 1991).

**43.** *Berry,* 978 P.2d at 95.

**44.** The shares were bought over time as per the buyback agreement.

**45.** *Fortson v. Fortson,* 131 P.3d 451, 462 n. 35 (Alaska 2006) (citing *Doyle v. Doyle,* 815 P.2d 366, 370 n. 6 (Alaska 1991)).

**480**

As explained above, the superior court heard testimony and took evidence regarding the property in question. While the testimony and evidence could lead to alternate findings, nothing in the record provides us with a definite and firm conviction that the superior court made a mistake.[46] The superior court's valuations and distributions of the contested property were not clearly erroneous and are therefore affirmed.

**C. The Superior Court Did Not Err By Finding That Helen "Shall" Retain Her Married Name.**

In its findings of facts and conclusions of law, the court found "that Ms. [K.] shall retain her married name." Helen argues that the superior court ordered her to retain her married name without her consent, thereby causing her additional expense and time delay. But the record does not reveal that she ever asked the court to restore her former name. In the absence of such a request, the court did not err in ordering that Helen would keep her married name. If Helen wants to change her name, she may either file a Civil Rule 60(b) motion with the superior court in this case or file a new petition for change of name pursuant to AS 09.55.010 and Alaska Rule of Civil Procedure 84.[47]

**V. CONCLUSION**

The superior court's decision regarding the value of Samuel's capital stock is REVERSED and REMANDED for further proceedings consistent with this opinion. On all other issues, the decision of the superior court is AFFIRMED.

---

**46.** *Fardig,* 56 P.3d at 11 (internal citations and quotation marks omitted).

**47.** AS 09.55.010 explains: "A person may bring an action for change of name in the superior court." Alaska Civil Rule 84 is entitled "Change of Name" and Rule 84(a) explains: "Every action for change of name shall be commenced by filing a verified petition entitled in the name of petitioner, showing the name which petitioner desires to adopt and setting forth the reasons for requesting a change of name."