Jimmy Kathryn McMASTER, Appellant,

v.

STATE of Alaska, Appellee.

No. 1425.

Supreme Court of Alaska.

July 16, 1973.

---

Herbert D. Soll, Public Defender, Meredith A. Wagstaff, Bruce Bookman, Lawrence Kulik, Asst. Public Defenders, Anchorage, for appellant.

John E. Havelock, Atty. Gen., Juneau, Seaborn J. Buckalew, Dist. Atty., Charles M. Merriner, Stephen G. Dunning, Asst. District Attys., Anchorage, for appellee.

Before RABINOWITZ, C. J., AND CONNOR, ERWIN, BOOCHEVER and FITZGERALD, JJ.

ERWIN, Justice.

Appellant was convicted, after jury trial, for the offense of second degree murder,[1] committed upon her spouse. In this appeal it is claimed that certain errors were committed by the trial court which require reversal.

In April of 1970 Jimmy Kathryn McMaster had been working at Indian House, on the Seward Highway south of Anchorage, Alaska, for several days before the incident which led to her conviction. On April 20, 1970, a party of four persons set out on a drive to Portage Glacier. The group consisted of Jimmy McMaster, her husband Michael McMaster, Corky Kelly, who was the manager of Indian House (and who later became Mrs. Henage), and Robert Henage, who was then Corky's fiance. The trip entailed stops at various establishments along the highway before returning to Indian House about nine hours later.

At the Bird House bar, Jimmy was heard to tell her husband, in response to his attempts to quiet her down, that she would shoot him if he did not leave her alone.

Jimmy testified at her trial that after returning to Indian House she followed her husband upstairs to their quarters. She found him dangling their infant son by the arm above his crib in the children's room. She took the child away, whereupon Michael knocked her to the floor. She kicked out at him in response. Jimmy then fol-

lowed Michael to their own room, where he pulled a gun from the dresser and aimed it at their five year old daughter Troy, who had followed them into the room. According to Jimmy, her husband was depressed because of his past and present inability to support his family. He said that "he was going to fix everything, that I wouldn't have to worry anymore. And I wouldn't have to support him and the children anymore." He cocked the gun, pointed it at Troy and said, "I'll take her first." Mrs. McMaster then pushed the gun aside, and it went off and shot her husband.

Mrs. McMaster's testimony was supported by that of five year old Troy who also testified that the gun had gone off when her mother attempted to push it aside. Similar evidence was given by Mel Cochran, the McMaster's oldest acquaintance in Alaska. Cochran testified that Michael, after being wounded, told him that the shooting was an accident. Michael said that he was going to die and asked Cochran to look out for his family.[2]

Corky Kelly (later Mrs. Henage) was a major witness for the state. Both she and her husband testified that Jimmy followed her husband up the stairs. Shortly thereafter they heard a shot. Corky reached the room right after Cochran and, while Cochran was briefly out of the room, Michael said, "Help me, Miss Corky, she shot me." Corky also testified that Troy told her that "she saw her mommy shoot her daddy."

1. AS 11.15.030:
   . . . [A] person who purposely and maliciously kills another is guilty of murder in the second degree, and shall be sentenced to imprisonment for a term of not less than 15 years to life.

2. There was considerable circumstantial evidence from which the jury could have found that the shooting was not accidental but intentional, and was inflicted by appellant.
   The entry wound of the bullet was about four inches above the umbilicus. It exited through the back, about perpendicular to the body's axis. It was not a "contact"

wound, i. e., the muzzle had not been held against the skin. Appellant's left hand exhibited powder burns after the incident. A ballistics expert conducted tests with the weapon found at the homicide scene and with deceased's garments. He concluded that the weapon was fired about 10 to 12 inches away from the deceased's garments, with a maximum and minimum possible distance of between 4 and 14 inches. Corky Kelly (Mrs. Henage) testified that after hearing a shot she went upstairs, found Mr. McMaster wounded, and that he said, "Help me, Miss Corky, she shot me."

On appeal it is claimed that the court erred in the following respects: (1) by commenting adversely in the presence of the jury, upon the prospective testimony of Troy McMaster, after having found that Troy was competent as a witness; (2) by allowing impeachment of Troy McMaster, through testimony about a prior inconsistent statement, without a foundation having been laid for such impeachment; (3) by permitting the prosecutor to use Troy's prior inconsistent statement in final argument as substantive evidence; (4) by refusing to give an instruction limiting the use of Troy's prior inconsistent statement to impeachment of the witness; and (5) by allowing cross examination of Jimmy McMaster about her failure to give a complete statement to a police officer who interviewed her after the shooting.

I

Troy was the only eyewitness to the shooting other than her father and mother. The defense wished to call her as a witness to testify on her mother's behalf. The trial judge was obviously troubled about letting a five year old child testify. Troy had been living with her mother the entire time since the shooting and was in her mother's custody. The judge was of the opinion Troy's testimony might be very helpful to the defense, but he was concerned about her age and the possible dangers inherent in the situation. He ruled favorably for the defense and found Troy competent to testify.[3] The judge then addressed the jury as follows:

Ladies and gentlemen, we've arranged to have little Troy McMasters [sic] testify. She'll be doing so as informally as possible so please bear with us. She's age 5 and the court is not vouching for her competency, it's very difficult to determine. However, counsel will try to get as much out of this child as they can as to her recollections. You're going to have to determine what you believe and how much of it and whether you think some of it may be fantasy or not. It'll be difficult, but I know you will bear with us.

Appellant insists that the court should have made no comment to the jury in connection with Troy's testimony and that by doing so, the judge invaded the province of the jury and implied that Troy's credibility was suspect.[4]

At common law there are many rules which operate to disqualify witnesses from testifying at trial. Over the years many of these disqualifications have been done away with.[5]

The question of competency of a particular witness to testify is now left in the sound discretion of the trial judge.[6] We are unable to find any abuse of such discretion herein.

Clearly there is no incapacity rule for children and the instruction given herein made the jury aware of the problem

3. Alaska R.Civ.P. 43(g)(1).

4. As a general rule it is said that the court is the judge of a witness's competency but that the credibility of a witness is a matter to be determined by a jury. However, competency to testify and credibility of a witness are concepts whose boundaries merge. When a judge decides that a witness is incompetent to testify, he is stating that the witness's ability to observe, to remember, to relate, or to be truthful is so impaired that his testimony is untrustworthy. When a witness is adjudged competent to testify, this merely means that he has some minimum ability to perform the four functions of a witness. It does not, however, mean that

he will do so. Counsel for either party may, of course, attempt to impeach his ability to observe, remember, relate and tell the truth in each particular case. Thus competency and credibility are concepts which weigh the same factors in evaluating a witness's testimony. Whether a testimonial impairment renders a witness incompetent or merely impeaches his credibility is simply a matter of degree.

5. C. McCormick, Law of Evidence § 61, at 139 (1954).

6. II J. Wigmore, Evidence § 507, at 597–98 (3d Ed. 1940); C. McCormick, Law of Evidence § 62, at 140–41 (1954).

in this case. A review of the testimony given at the trial by Troy McMaster reveals understanding of the events, an ability to relate her observations and an understanding of the requirement of telling the truth.[7]

## II

On direct examination Troy made the following explanation of the shooting incident:

Q. And what did he do with the gun?

A. He—he was pointing it to me and my mom took the gun and

.  .  .  .  .

Q. And what did you see?

A. And that—and then the gun pushed over in the stomach and then my—then my father—he—he was playing with the gun, he didn't know how to push it and—and he shot hisself (sic).

.  .  .  .  .  .

Q. Did your mommy ever hold the gun?

A. No.

Q. Was it just your daddy?

A. Yes.

During cross examination the state asked Troy if she had talked to anyone about what happened but did not go further after her answer of no.[8] Subsequently, the state called Robert and Corky Henage (Kelly) to rebut the child's statements.[9]

Corky Henage testified, over objection as follows:

Q. Did you have any conversation with the little girl?

A. Yes, I did, sir.

Q. Where did that take place?

A. Downstairs.

Q. To the best of your recollection what was the substance of that conversation?

.  .  .  .  .  .

A. Well, the little girl was crying downstairs when I came down, and she said she saw her mommy shoot her daddy and he fell down, but he'll be all right tomorrow and we tried to convince her that her daddy just had a little belly ache.

Q. You're sure of those words?

A. Yes, sir, I am.

In permitting the testimony, the court overruled the defense objection as to lack of a proper foundation, noting the inherent difficulty of applying normal evidentiary rules to the testimony of a 5-year old child.

■ Generally, a predicate is required before introducing a prior statement inconsistent with present testimony,[10] but this rule should not be mechanically applied in every instance. This is particularly true when the court is dealing with the testimony of a child of tender years. The trial judge should exercise his discretion to see

---

7. Alaska R.Civ.P. 43(g)(1) made applicable to criminal cases by Alaska R.Crim.P. 26(a), sets forth the grounds upon which a person may be disqualified as a witness.

8. The entire questioning on this subject was as follows:
   Q. Who was your friend that took you downstairs, do you remember?
   A. A big friend.
   Q. A big friend. Was it a lady friend or a man friend?
   A. A man friend.
   Q. Do you know who he was? Do you remember his name?
   A. I forgot it.
   Q. Did you talk to him about what happened?
   A. No.

Q. Do you remember talking to Miss Corky about what happened?
A. I didn't. Is that—is that all I have to tell you?
Q. Um-hum. Just about.
A. What else?
Q. Do you remember talking to anybody else about what happened?
A. No, I didn't.
Q. What had you been doing that day?
A. That's all I remember. Is that all I can tell you?

9. An examination of the testimony of Robert Henage fails to disclose any real inconsistency with the testimony of Troy.

10. Alaska R.Civ.P. 43(g)(11)(c).

that the testimony is fairly presented to the jury. Professor Wigmore expresses this view in this manner:

> A due consideration for these arguments leads to the conclusion that in general the preliminary question should indeed be put, before producing the alleged contradiction; but that this requirement, instead of being rigid and invariable, should be open to exceptions, and should be dispensed with, in the court's discretion, where the putting of the question has become impossible and the impeaching party has acted in good faith.[11]

Professor McCormick agrees that there is an area where the question of what is proper foundation should be left to the discretion of the trial court:

> The preliminary question requirement when complied with conduces to fairness and economy of time. When overlooked by the impeacher, as it often is, then it seems that the judge should have a discretion to consider such factors as whether the impeaching counsel knew of the inconsistent statement when he cross-examined, the importance or unimportance of the testimony under attack, and the practicability of re-calling the witness for denial or explanation, and in the light of the circumstances, to permit the impeachment without foundation if it seems fairer to do so.[12]

It should be noted that these views and the identical view adopted by the Model Code of Evidence,[13] the Uniform Rules of Evidence[14] and many commentators[15] are expressed without direct reflection on the other crucial problem in this case: *the fact that the witness in question was only five years old.*

Authorities are almost unanimous in their view that the competency and cross examination of infants is an area where the trial court must be allowed great latitude.[16] The inability to cross examine a child of tender years in the adversary sense of the term is a great practical problem in any case where such a witness appears. We should not ignore either the practical impossibility inherent in any meaningful cross examination of such a witness or the need to insure the basic credibility of any testimony given by such a witness.

We have carefully examined the testimony of Troy and note many instances on both direct and cross examination where straight-forward questions lead to unresponsive answers.[17] The transcript further records inconsistencies in the answers

---

11. IIIA J. Wigmore, Evidence § 1027, at 1023 (Chad.Rev.1970).

12. C. McCormick, Law of Evidence § 37, at page 70 (1954).

13. American Law Institute, Model Code of Evidence, Rule 106, Comment on Paragraph 2 at 94 (1942).

14. *See* Rule 22(b), Uniform Rules of Evidence.

15. Hale, Impeachment of Witnesses by Prior Inconsistent Statements, 10 So. Cal.L.Rev. 135 (1937); M. Ladd, Some Observations on Credibility: Impeachment of Witnesses, 52 Cornell Law Quarterly, 239, 247 (1967); Note, Modification of the Foundational Requirement for Impeaching Witnesses: California Evidence Code Section 770, 18 Hastings Law Journal 210 (1966).

16. II J. Wigmore, Evidence, §§ 505–09 (3rd ed. 1940); Stafford, The Child as a Witness, 37 Wash.L.Rev. 303 (1962); Note, The Problem of the Child Witness, 10 Wyo.L.J. 214 (1956).

17. We further note that the testimony most favorable to the defense theory of the case came on redirect examination in response to leading questions:
    Q. Are you sure you understood all the questions that that man next to you asked you?
    A. Yes.
    Q. Do you know when he asked you if you saw your mommy do anything in the room you said no.
    A. I know.
    Q. Did you see her do anything with the gun in that room?
    A. She didn't do nothing with the gun.
    Q. Did she touch it?
    A. No.

to questions of both the state and the defense which clearly bear upon Troy's understanding of the questions themselves and the events she was relating. The appellant could have recalled Troy to explain any possible inconsistencies but elected not to do so. Since appellant's testimony was also impeached in several respects by other witnesses, we find little merit to the argument that the manner of impeachment used had significant impact in the case.

■ Our examination of the entire testimony leads us to the conclusion that the trial judge did not abuse his discretion in overruling appellant's lack of proper foundation objection.

### III

Appellant's next claim of error is that the prosecutor, in final argument, should not have referred to the impeachment testimony presented in rebuttal by Mrs. Henage as though it provided substantive evidence.

■ We do not think this point is well taken. Defense counsel made no objection during the prosecutor's argument. This failure to make timely objection is sufficient to warrant our refusal to consider the point further.

■ Appellant's next claim is that the court erred in refusing to instruct the jury that Troy's statements to the Henages could be used only for impeaching Troy's credibility, and for no other purpose. This point is controlled by Beavers v. State, 492 P.2d 88, 94 (Alaska 1971), where the court held that inconsistent statements used for impeachment could be used as substantive evidence. Thus it was not error to refuse the requested instruction.

Q. When it was in your daddy's hand did she touched (sic) it?
A. Yes, only one time.
Q. And show me what she did. Can you show me?
A. She pushed it, she just . . . .
Q. Can you push my hand like she did, push it?

Appellant's last point concerns certain questions asked of her by the prosecutor during cross examination. It is claimed that the questions prejudiced appellant by implying that she wrongfully withheld information from one of the investigating officers at the scene shortly after the shooting.

■ The questions were not objected to, although at a later time during the trial defense counsel expressed an objection to the earlier line of questioning without, however, asking for any particular remedy from the court. We will not consider the point when it is raised for the first time on appeal.

Judgment of the trial court is affirmed.

CONNOR, Justice, with whom BOOCHEVER, J., joins (concurring in part and dissenting in part).

I agree with the majority's conclusion with regard to (1) affirming the trial court's decision to let the five year old child testify; (2) dismissing as untimely appellant's contention that the prosecutor, in final argument, should not have been referred to Troy's utterance to Mrs. Henage as though it provided substantive evidence; and (3) upholding under Beavers v. State, 492 P.2d 88 (Alaska 1971), the trial court's refusal to instruct that the child's statements to the Henages could be used for impeachment purposes only. I must respectfully dissent from the majority's decision to erode the protections embodied in the foundation requirement under the banner of affording trial courts necessary latitude in the conduct of trials.

A. She pushed it.
Q. Then what did you see after that?
A. That's all.
Q. When did the ball of light come?
A. When—when my dad shot the gun.
Q. Did that happen when your mommy pushed it?
A. Yes.

Briefly recapitulating the pertinent facts, Troy McMaster testified as a defense witness on direct and on cross-examination that her father shot himself. During cross-examination of Troy the state failed to lay any foundation for impeachment, but it later called Robert and Corky Henage (Kelly) to rebut the child's testimony with prior inconsistent statements.[1] The court overruled the defense objection of lack of foundation, stating, "I would not allow Mr. Burke [State's attorney] to lay any foundation to impeach a five-year old." The court further implied that it had suspended normal evidentiary rules in allowing a five-year old to testify and would do likewise in order to clarify the child's testimony.

In Alaska, our rules require the laying of a foundation before introducing a witness' prior inconsistent statement:

"A witness may be impeached by evidence that he has made at other times statements inconsistent with his present testimony. The statements must first be related to him, with the circumstances of times, places, and persons present, and the witness shall be asked whether he has made such statements and, if so, shall be allowed to explain them." Alaska Rule of Civil Procedure 43(g)(11)(c).[2]

The majority counters that this rule "should not be mechanically applied in every instance . . . particularly . . . when the court is dealing with the testimony of a child of tender years." It musters a battery of authorities who view the determination of competency and the cross-examination of infants as "an area where the trial court must be allowed great latitude," and notes instances where the child gave unresponsive answers to questions submitted on both direct and cross-examination. Finally, it concludes that:

"The appellant could have recalled Troy to explain any possible inconsistencies but elected not to do so. Since appellant's testimony was also impeached in several respects by other witnesses, we find little merit to the argument that the manner of impeachment used had significant impact in the case."

Conceding that the trial court needs great flexibility in dealing with child-witnesses, I think that such considerations go more accurately to the first question presented in this appeal. The foundation requirement, in my view, does not simply mediate the relationship between court and witness; it also accommodates the party-proponent's interest in preserving the credibility and forcefulness of the witnesses he

---

1. Robert Henage's testimony in fact revealed no prior inconsistent statement. Corky Henage, however, testified, over objection, as follows:

"Q. Did you see the little girl, Troy, following the shot?
A. Yes, sir.
Q. Where did you see her?
A. She was upstairs in the back—in the other bedroom across the hall.
Q. All right, when you went up there?
A. Yes, sir.
Q. Was she later removed from there?
A. Yes, she was.
Q. Did you have any conversation with the little girl?
A. Yes, I did, sir.
Q. Where did that take place?
A. Downstairs.
Q. To the best of your recollection what was the substance of that conversation?
A. Well, the little girl was crying downstairs when I came down, and she said she saw her mommy shoot her daddy and he fell down, but he'll be all right tomorrow and we tried to convince her that her daddy just had a little belly ache.
Q. You're sure of those words?
A. Yes, sir, I am."

2. Alaska Criminal Rule 26(a) provides that Alaska Civil Rule 43 shall govern the admissibility of evidence in criminal trials. Professor McCormick enumerates three purposes behind this foundation requirement: "(1) to avoid unfair surprise to the adversary, (2) to save time, as an admission by the witness may make the extrinsic proof unnecessary, and (3) to give the witness, in fairness to him, a chance to explain the discrepancy." McCormick, Evidence § 37 at 72 (2d Ed. 1972).

calls to testify on his behalf. Thus, if no other purpose would have been accommodated, the laying of a proper foundation would have obviated the possibility of surprising defense counsel. While I acknowledge Troy's limited attention span and the tendency of her testimony to stray from questions put to her, I am unable to say that she could not have given "meaningful" responses to proper questions concerning what she may have said to the Henages on the night in question.[3]

Turning to the majority's putting the burden of recalling Troy on appellant, I think this argument proves too much. To accept it would seem to renounce the foundation requirement completely. In the case at bar, the State has failed to satisfy the rule. The majority in effect would require a defendant to cure the prosecution's deficiency. I agree with the commentators who argue against slavish adherence to formalistic rules. I concede that fact situations might arise for which we should be willing to relax the foundation requirement.[4] Nevertheless this is not such a case.[5]

As for appellant's testimony having been impeached by other witnesses, I cannot see what relevance this has to the question of permissible impeachment of her five-year old daughter's testimony.

On *voir dire* and during her testimony, Troy was asked by the prosecutor if she knew a lady named Miss Kelly or Corky, if she talked with anyone about what happened to her father, if she remembered talking to Miss Corky about what happened. But she was not asked if she had ever told Miss Corky that her mother had shot her father. In short, the prosecution came up to the edge of complying with the foundation rule on at least three occasions and each time stopped just short.

In my opinion it would have been a simple matter for the prosecution to ask the one additional question required for compliance with the rule. Since Troy was the only eyewitness to the shooting, it is highly probable that the jury would place great weight on her testimony and would place correspondingly great weight on evidence tending to impeach her. In light of the crucial role of this little girl's testimony in the overall fabric of the evidence, I "cannot fairly say that the evidence did not appreciably affect the jury's verdict against appellant."[6] Accordingly, I would rule that the admission of Corky Henage's testimony into evidence constitutes reversible error.

3. For example, she might have explained her testimony that "she saw her mommy shoot her daddy" by stating that her mother was trying to get the gun away from her father when it went off.

4. I note in passing that California has adopted such a rule. See Cal.Evid.Code § 770. Unlike the California statute, which specifically articulates an exemption from laying a foundation where "the interests of justice otherwise require," the Alaska Rules of Evidence contain no such exemption. However, reliance could be placed on Alaska Criminal Rule 53 (identical to Alaska Civil Rule 94), which provides:
    "These rules are designed to facilitate business and advance justice. They may be relaxed or dispensed with by the court in any case where it shall be manifest to the court that a strict adherence to them will work injustice." In any event I am not prepared to press this rule into service in the case at bar.

5. The little girl having once been subjected to cross-examination, the defense should not be required to recall her to remedy the prosecution's failure to lay a foundation. Moreover, any explanation given by the little girl on recall would have been weakened by inferences that she may have been coached.

6. Love v. State, 457 P.2d 622, 632 (Alaska 1969).