*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| VINCE B., | ) | |
| | ) | Supreme Court No. S-16616 |
| Appellant, | ) | |
| | ) | Superior Court No. 3SW-16-00120 CI |
| v. | ) | |
| | ) | O P I N I O N |
| SARAH B., | ) | |
| | ) | No. 7264 – July 27, 2018 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Anna Moran, Judge.

Appearances: Andy L. Pevehouse, Gilman & Pevehouse, Kenai, for Appellant. Jimmy E. White, Hughes White Colbo Wilcox & Tervooren, LLC, Anchorage, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

WINFREE, Justice.

## I.       INTRODUCTION

A man appeals a long-term domestic violence protective order entered against him for stalking his ex-wife. He argues that the superior court: (1) abused its discretion and violated his due process rights in its treatment of his ten-year-old son's proposed testimony; (2) violated the doctrine of ripeness by warning that future conduct could justify a stalking finding; (3) violated the doctrine of res judicata by reconsidering a claim that it previously had adjudicated in an earlier domestic violence petition; and

(4) failed to make requisite findings of fact meeting the elements of stalking. He asks us to vacate the order. Seeing no error, we affirm the superior court's protective order.

## II. FACTS AND PROCEEDINGS

### A. Facts

Sarah and Vince B.[1] divorced in September 2016 and share custody of their two sons, ages 12 and 9. The couple separated two and a half years prior to the divorce; the proceedings have been prolonged and unfriendly. The parties have struggled to communicate in the course of their shared custody, often hurling profanities at one another. Sarah's new boyfriend has been a particular source of conflict. In February 2016 Vince dropped the children off at Sarah's boyfriend's house while she was not present. Vince struck Sarah's boyfriend in the face, prompting a call to the police. Several other hostile exchanges in 2016 led Sarah to file two domestic violence protective order petitions. The first was denied; the second was granted, in part based on testimony from the first petition, and is the subject of this appeal.

#### 1. First petition

In April 2016, while the divorce case was pending, Sarah filed the first domestic violence protective order petition against Vince. At the hearing, corroborated by two witnesses, Sarah testified that Vince had shoved her and made crude comments in a school gym where both were attending a school concert. Sarah also testified that Vince had punched her boyfriend in front of their children, that he "said cruel words" to her, and that he twice drove by her place of work, once making an offensive hand gesture.

Vince denied the crude statements and said he "accidentally bumped the side of her back" with his knee in the school gym. He perceived that Sarah "kind of

---

[1]     We use initials to protect the parties' children's privacy.

lunged sideways towards her friends" and that her physical response to his contact was an overreaction. Vince also testified that he had serious problems with Sarah's boyfriend because he had "criminal stalking charges against him" as well as multiple restraining orders and Vince believed it "psychologically dangerous to [his] children" to be at her boyfriend's house.

The court denied the petition despite finding there was "good circumstantial evidence" that Sarah "was shoved, and this was more than a mere accident." The court nevertheless held that Vince's conduct did not rise to the level of harassment, assault, or stalking. With specific respect to stalking, the court explained that "the hard part for [stalking] is it has to be a course of conduct, so more than one incident, that places her in fear of death or physical injury." The court found that Vince's course of conduct did not yet "rise to the level of stalking." Talking to both Sarah and Vince, the court did, however, put Vince on notice that another wrong move could make Sarah eligible for a domestic violence stalking order:

> But I tell you all this because I'm not finding domestic violence in this instance, but I'm putting [Vince] on [notice] that he's now engaged in a course of conduct that has placed you in fear of physical injury, and if he does — touches you . . . or do[es] anything else to you, I will issue a DV order, okay, because now you have engaged in a course of conduct.
>
> You know, flipping her off, coming into the bleachers, sitting down next to her when you knew she didn't want you to be there, or she moves away from you, you leave and you come back, and I don't buy it for a minute that you inadvertently kneed her in the back, I don't buy it for a minute.
>
> So because of that finding, if you do anything else to her, she will be in fear of imminent physical injury and you will be — you will be eligible — she will be eligible for a

domestic violence stalking order and you could be facing criminal charges. I just want that really clear. Is that clear?

Vince indicated he understood, responding, "Yes, ma'am."

To address Vince's concerns about Sarah's boyfriend, the court required that the boyfriend not have contact with the children. But the court also suggested that Vince get mental health counseling because his obsession with Sarah's partners was "sounding kind of creepy." The court repeatedly warned Vince that he should avoid contacting Sarah or her boyfriend in a manner that suggested stalking. Notably, the court told Vince that "he can't be driving by or acting in a certain way or he could be subject to domestic violence stalking. So I just want that really clear . . . ." The court further suggested the parties limit their texts and other communications to those concerning the children.

### 2. Post-divorce

The parties reached a custody agreement in July 2016, and by September Sarah and Vince finalized their divorce. Their communications continued to sour thereafter. Vince's emails were increasingly aggressive in tone and content. Vince referenced Sarah's "unnecessary, hurtful, nasty and hate filled rhetoric toward" him, calling it "emotionally damaging." Vince threatened to call the police if Sarah's boyfriend contacted him, and he requested that Sarah not speak to him unless through an attorney. In a September email Vince called Sarah profane names, blaming her for a provision in their divorce settlement requiring him to sell a property where his father was living and had planned to retire.

In an October email Vince lambasted Sarah for her relationships with other men and their impact on the children. He used sexually explicit profanities and wrote: "You need to make sure that [your boyfriend] understands if he is around our kids let alone continues to yell and verbally, [m]entally or physically abuse our kids he is going

to be. Very. Very. Very Sorry." The next day Vince and Sarah got into a heated argument over their custody days and Vince threatened to call the police if Sarah did not give him the children. In November Vince informed Sarah that he "might be" traveling to visit his ailing father, and he wrote: "Be sure and tell [your attorney] so he can tell the judge what a no good SOB I am for leaving again."

### 3. Second petition

In late December Sarah again petitioned for a long-term domestic violence protective order. Sarah alleged that since their last court appearance Vince had continued to harass her by text, email, and phone. Sarah relayed that on Christmas Eve, he called "[her] cell to talk to [their] children"; after he was done, he asked to speak to her. Sarah put him on speaker phone with her mother in the room. Vince proceeded to yell, call her profanities, and make explicit comments about her sexual relations with her boyfriend.

Sarah contended that two days after the hostile Christmas Eve phone conversation, she met Vince for their scheduled exchange of the children. The boys got out of her car and walked to his without any communication between the parents. Vince drove away first; Sarah left after him. Vince had pulled over on the side of the road, and Sarah passed him while she was on her way to her boyfriend's house. After Sarah arrived at her boyfriend's house, she saw Vince's truck drive slowly by and then double back, stopping at the end of the driveway. Because Sarah's boyfriend and Vince had previously fought in front of the children and each man had taken legal steps to avoid future contact with the other, she could think of no good reason for Vince to follow her there. He then drove into the driveway and parked in front of the house. According to Sarah, she felt "pani[c]ky" and called the troopers. She feared that the situation would "escalate" without their involvement and that Vince could "snap" given his post-traumatic stress disorder (PTSD) diagnosis and the fact that he "packs a gun with him."

In response to Sarah's petition, a magistrate judge granted a 20-day ex parte domestic violence protective order and set a hearing for January 12, 2017. Vince moved to change the hearing date and to allow his son, who was then ten years old, to testify. Vince stated that, although he did not want to involve his young son, his son was his "only witness" and could testify that the reason Vince was at Sarah's boyfriend's house "was simply because [the child] needed something from his mother and wished to speak with her."

## B.    Proceedings

The parties, without counsel, telephoned in for a brief hearing on January 10. They discussed the son's testimony and agreed to continue the domestic violence hearing to January 13. The court repeatedly questioned the necessity of the child's testimony and eventually suggested: "[L]et's keep [the child] out of it and let's just assume that [he] would testify that his dad brought him there to talk to [his mom] and he went to the door." Vince and Sarah both agreed that they did not want their son to have to testify and that he need not attend trial.

The court also recommended that the parties familiarize themselves with criminal trespass and stalking statutes. When Vince expressed confusion, the court explained that "[s]talking usually is a course of conduct," and again directed Vince to look at the statute defining stalking in the second degree because "that's what the [c]ourt has to base its decision on."

Both Vince and Sarah testified at the hearing, where they were represented by counsel. Sarah's testimony was largely consistent with her petition. She testified about the emails and phone call preceding the incident and about how Vince's increasingly aggressive tone placed her in fear. She also described a hostile encounter at their son's birthday party, when Vince suddenly "demand[ed]" she end the party and exchange the children with him, repeatedly stating: "If you don't give me my kids, I will

call the cops." Sarah testified that when Vince followed her to her boyfriend's house without notice, with the children in the car, she "panicked" and called the troopers because she feared violence and "[t]here was no reason for him to be there." She added that over the eight years of their marriage Vince had taken antidepressants for PTSD and mood swings; she believed "he's ready to snap" and "needs mental help."

During Sarah's cross-examination, the court took the opportunity to "redirect" Vince's counsel, who was not present at the hearing on the first petition, to focus on the stalking issue. The court explained it was considering whether these recent incidents combined with the kneeing incident placed Sarah in fear of physical injury:

> There was no question that something happened [at the school gym] and that she was afraid. I thought it was more 50/50. I couldn't get the one percent.
>
> But I can tell you his behavior since then is convincing me that one percent is tipping in her favor. And we had a lot of testimony about what's going on, the behavior between these two parties and . . . I thought he [had] mental health issues, because he kind of liked to intimidate, or he was unwinding . . . at the trial. It sounds like he's continuing to unwind, and that subsequent behavior I can consider and revisit . . . the testimony I've already heard, which I said was really close. It was . . . by a hair. That hair is tipping now in her favor, just so you know where I'm coming from.

After Sarah finished testifying, Vince relayed his version of events. Vince explained that he had stopped alongside the road because his son was "panicking because he needed [a particular] game" and Vince "walked along the side of the pickup on the passenger's side to help him look for this game." When they couldn't find the game, Vince testified he saw "[his] ex-wife [drive] by, so I followed her out to [her boyfriend's] house." Because he had been there only once before, he relied on his children to give him directions and missed the driveway. After circling back, Vince testified that he "got

out of the pickup with [the child], [and] walked to the door." He then "knocked on the door like three or four times . . . probably 15, 20 seconds at the door," before "walk[ing] back to [his] pickup so [the child] could speak to his mother and get the game he wanted." When no one answered the door after a few minutes, they went home.

Vince explained he did not just call or text Sarah because they "don't communicate" and she "rarely answers the phone" when he calls. But he admitted that "with all this that's going on, I probably should not have driven out there with my son so he could get the game."

The court granted the petition, finding that the dynamic between the former couple was more than merely unpleasant and that the sum of Vince's actions had placed Sarah in fear of physical injury. The court noted that it had been "very clear with [Vince] at the last hearing," warning him that it was a "close case" and recommending that he "get some mental health counseling" because he was "overly obsessed with [Sarah] and her boyfriend" and "subsequent behaviors could cause the court to revisit this issue." The court observed that Vince's "obsession with [Sarah's] relationship . . . is continuing. . . . All of his claims are about concern and safety for his kids, but they always circle back to [Sarah's] relationship . . . ."

The court found Vince's explanation about picking up a video game "extremely wishy washy," given the history of hostility between him and Sarah's boyfriend, Vince's efforts to keep his children away from the boyfriend, and the availability of other avenues, like phone or text, to resolve the issue. It then concluded:

> I think this is a course of conduct, him driving by her work and going to the school, coming sitting next to her. He did push her. That's enough to recklessly place fear in her of some kind of physical injury.
>
> So I am finding he is gone over the top and now by a preponderance of the evidence that there is stalking . . . .

The court found stalking in the second degree[2] and granted the domestic violence protective order. Vince appeals.

## III. STANDARD OF REVIEW

The superior court's decision to grant or deny a protective order is reviewed for abuse of discretion.[3] So too is the decision whether to let a child testify.[4] Whether there was a violation of due process is a question of law.[5] Interpretation of a statute is also "a question of law which involves this court's independent judgment."[6] "We apply our independent judgment to issues of res judicata,"[7] and "[q]uestions of ripeness are

---

[2] *See* AS 11.41.270(a) ("A person commits the crime of stalking in the second degree if the person knowingly engages in a course of conduct that recklessly places another person in fear of death or physical injury, or in fear of the death or physical injury of a family member.").

[3] *Cooper v. Cooper*, 144 P.3d 451, 454 (Alaska 2006).

[4] *See Helen S.K. v. Samuel M.K.*, 288 P.3d 463, 475 (Alaska 2012); *McMaster v. State*, 512 P.2d 879, 881 (Alaska 1973); *Sawyer v. State*, 244 P.3d 1130, 1135-36 (Alaska App. 2011).

[5] *D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 207 (Alaska 2000).

[6] *Cooper*, 144 P.3d at 434 (quoting *Odum v. Univ. of Alaska, Anchorage*, 845 P.2d 432, 454 (Alaska 1993)).

[7] *Patrawke v. Liebes*, 285 P.3d 268, 271 n.7 (Alaska 2012) (quoting *McComas v. Kirn*, 105 P.3d 1130, 1132 (Alaska 2005)).

reviewed de novo."[8]  We review the factual findings underlying a domestic violence protective order for clear error.[9]

## IV.  DISCUSSION

### A.    The Superior Court Did Not Abuse Its Discretion Or Violate Procedural Due Process Regarding The Child's Testimony.

Vince argues that the court abused its discretion and violated his due process rights "by disbelieving" his son's anticipated testimony after previously stating "it would accept [the testimony] as true."  Vince contends it is procedurally unfair that the court effectively "revers[ed]" its prior ruling and gave no warning that sparing the child from the witness stand due to his age would deprive Vince of a defense.  Vince asserts that his son's testimony was critical to his defense against stalking for two reasons:  first, it proved that knocking on Sarah's boyfriend's door was not a "nonconsensual contact"; and second, it revealed that his actions could not, under an objective standard, have placed Sarah in fear of physical injury.  Vince claims that, but for his reliance on the court's representation that it would accept his son's anticipated testimony as true, he would have insisted his son testify at the hearing.

A decision to permit or exclude the testimony of a child witness generally is reviewed for an abuse of discretion.[10]  When assessing a due process claim, we turn

---

**8**      *RBG Bush Planes, LLC v. Kirk*, 340 P.3d 1056, 1060 (Alaska 2015) (citing *State v. Am. Civil Liberties Union of Alaska*, 204 P.3d 364, 368 (Alaska 2009)).

**9**      *McComas*, 105 P.3d at 1132.

**10**     *See Helen S.K. v. Samuel M.K.*, 288 P.3d 463, 475 (Alaska 2012) (holding court "did not abuse its discretion in deciding to conduct in camera interviews" rather than have children testify in open court in child custody case); *McMaster v. State*, 512 P.2d 879, 881 (Alaska 1973) (holding decision to let particular witness testify is "left in the sound discretion of the trial judge" and affirming decision to allow five year old to

(continued...)

to the factors enunciated by the United States Supreme Court in *Mathews v. Eldridge*.[11] We consider "[f]irst, the private interest that will be affected by the official action," then "the risk of an erroneous deprivation of such interest through the procedures used," and finally, "the Government's interest, including the . . . fiscal and administrative burdens that the additional or substitute procedures would entail."[12] We have held that a court's decision to control the manner in which a child's testimony is taken into account does not necessarily violate a parent's due process rights.[13]

We are unpersuaded by Vince's arguments. The due process assertion is unavailing because the court's approach to the child's testimony posed no "risk of an erroneous deprivation" of Vince's interest in putting forth a defense to the stalking allegation.[14] At no point did the court mislead Vince by representing it would accept the child's anticipated testimony as true. The court stated, "*let's just assume that [the child] would testify* that his dad brought him there to talk to [his mother] and he went to the door." This was not an assurance that the child's testimony would conclusively establish

---

[10] (...continued)
testify); *Sawyer v. State*, 244 P.3d 1130, 1136 (Alaska App. 2011) ("It was not an abuse of discretion for the judge to conclude that any marginal probative value of the children's testimony was outweighed by the danger of unfair prejudice . . . .").

[11] 424 U.S. 319, 334-35 (1976); *D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 212 (Alaska 2000).

[12] *Mathews*, 424 U.S. at 334-35.

[13] *See Helen S.K.*, 288 P.3d at 475 ("The parents' due process rights were observed by the summary of information from the [in-camera] interviews provided by the court.").

[14] *Mathews*, 424 U.S. at 334-35.

that Vince's motives in driving to Sarah's boyfriend's house were benign or would outweigh other credible testimony supporting a stalking finding.

Perhaps more significantly, the court did not deprive Vince of the benefit or substance of the anticipated testimony. The court adhered to Vince's version of what his son would testify to and never stated that it was false. Vince suggests that because the court remarked that "there was absolutely no reason for [Vince] to go to [Sarah's boyfriend's] home," it disbelieved that the child actually asked to speak to his mother and retrieve a game. This mischaracterizes the court's full holding — that Vince "could have done this by phone or text or some other means" and that his justification for following Sarah to her boyfriend's house was not a reasonable one in light of other credible testimony suggesting Vince's actions here, despite "claims . . . about concern and safety for his kids," were more motivated by his "obsession" with his ex-wife's new relationship than the child's need to pick up a game. Because the court adopted the anticipated testimony Vince proffered and did not mislead him in any way, his due process arguments fail.

We also conclude the court did not abuse its discretion by allegedly "reversing its prior ruling" on the child's testimony because, as discussed above, no such reversal occurred. The court consistently said it would accept Vince's version of what the child would say if he took the stand, and it considered that version of events against other testimony in its final ruling. Because no "revers[al]" occurred, the court's findings and conclusions at the hearing did not "substantially deviate from [its] earlier oral

decision."[15]  And the court was within its discretion to spare the child from testifying in open court about a domestic violence and custody battle between his parents.[16]

We thus decline to vacate the protective order on either basis Vince asserts.

## B.      Neither Ripeness Nor Res Judicata Was Implicated.

Vince contends the superior court erred by considering the substance of the first petition in its grant of the second, and he asks us to vacate the order on two grounds: the doctrines of ripeness and res judicata.  We examine each in turn.

### 1.      Ripeness

Vince argues that the court's warning to him at the May 2016 hearing — that any future misconduct could result in a protective order — was a "prognosticative ruling in violation of the doctrine of ripeness."[17]  Because the court ruled that Sarah was "not placed in fear" of imminent physical injury by the kneeing incident, Vince contends

---

[15]      *See Ogden v. Ogden*, 39 P.3d 513, 518 (Alaska 2001) (concluding discrepancies between oral and written decisions required remand).

[16]      *See Helen S.K.*, 288 P.3d at 475; *Sawyer v. State*, 244 P.3d 1130, 1136 (Alaska App. 2011); *see also* AS 12.45.046(b) (enumerating factors superior court must consider in deciding whether child may testify in criminal proceedings, including "the mental or emotional strain that will be caused by requiring the child to testify under normal courtroom procedures").

[17]      "A case is justiciable only if it has matured to a point that warrants decision."  *State v. Am. Civil Liberties Union of Alaska*, 204 P.3d 364, 368 (Alaska 2009).  A suit ripe for declaratory or injunctive relief will present " 'a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality.' "  *Jacko v. State, Pebble Ltd. P'ship*, 353 P.3d 337, 340 (Alaska 2015) (quoting *Brause v. State, Dep't of Health & Soc. Servs.*, 21 P.3d 357, 359 (Alaska 2001)).  "[R]ipeness turns on 'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.' "  *Brause*, 21 P.3d at 359 (alteration in original) (quoting 13A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 3532, at 112 (2d ed. 1984)).

the court's admonition that "if [he] [did] anything else to her, she [would] be in fear of imminent physical injury" constituted a ruling over a speculative, inchoate dispute. Vince characterizes this warning that he not do "anything" as "injunctive" and "impermissibly over broad" given the parties' regular interaction in sharing custody.

We conclude the superior court did not violate the doctrine of ripeness when it warned Vince that he was on the road to placing Sarah in fear of physical injury sufficient to satisfy a domestic violence finding. A reasonable reading of the court's reasoning does not suggest that the court bound itself to grant any petition Sarah brought in the future, irrespective of its merits. Rather, the court was saying that Vince was dangerously close to crossing over the threshold between an isolated incident that made Sarah afraid and a course of conduct sufficient to establish stalking. This statement was a warning, not a ruling, and thus does not raise issues of ripeness.

### 2. Res judicata

Vince also argues that res judicata barred the superior court from considering the events of the first domestic violence petition, which it had previously denied, to support its conclusion that Vince engaged in a course of conduct that recklessly placed Sarah in fear of physical injury. He asserts that by doing so, the court effectively reversed its earlier ruling that the kneeing incident did not place Sarah in fear of imminent physical injury. Vince argues that the court relied exclusively on the previously adjudicated kneeing incident to find that Sarah feared physical harm, pointing to the court's statement: "He did push her. That's enough to recklessly place fear in her of some kind of physical injury." According to Vince, this exclusive reliance implicates res judicata.

"Res judicata, or claim preclusion, bars relitigation of a claim when there is '(1) a final judgment on the merits, (2) from a court of competent jurisdiction, (3) in

a dispute between the same parties (or their privies) about the same cause of action.' "[18] But the statutory elements of stalking in the second degree include whether "the person knowingly engage[d] in *a course of conduct* that recklessly place[d] another person in fear of death or physical injury, or in fear of the death or physical injury of a family member."[19] A course of conduct is defined as "repeated acts of nonconsensual contact involving the victim or a family member."[20] The statute requires the court to revisit past conduct to decide the import of subsequent conduct. And we have held that the denial of an earlier petition for a protective order does not necessarily bar the court from considering the same conduct in deciding a later petition.[21]

Res judicata does not apply here for several reasons. First, Sarah's second petition raised new claims of stalking and harassment.[22] Second, the parties did not actually relitigate the kneeing incident, nor did the court reverse its previous decision.

---

[18] *McAlpine v. Pacarro*, 262 P.3d 622, 625 (Alaska 2011) (quoting *Angleton v. Cox*, 238 P.3d 610, 614 (Alaska 2010)).

[19] AS 11.41.270(a) (emphasis added).

[20] AS 11.41.270(b)(1).

[21] *See McComas v. Kirn*, 105 P.3d 1130, 1135-36 (Alaska 2005) (holding res judicata did not apply where court dissolved first protective order because ex-husband was in prison but granted second protective order upon finding ex-husband continued to contact victim while in prison and was soon to be released); *Fardig v. Fardig*, 56 P.3d 9, 11-12 (Alaska 2002) (holding neither res judicata nor collateral estoppel barred court from considering issue of alleged drug use raised and dismissed in previous domestic violence hearing because doing so in "the context of a motion to modify custody" and upon evidence of new drug use did "not relitigate a past decision").

[22] *See McComas*, 105 P.3d at 1135-36; *Fardig*, 56 P.3d at 11-12; *McAlpine*, 262 P.3d at 627 (concluding res judicata did not bar mother from basing motion to modify custody on past domestic violence incidents and new claims of domestic violence that superior court had not addressed or sufficiently considered).

In its hearing on the first petition, the court found that Vince had kneed Sarah intentionally. Reference to this prior finding in the subsequent hearing did not constitute a retroactive finding, relitigation, or reversal: the court simply considered whether the kneeing incident, in conjunction with the incidents alleged in the second petition, constituted a course of conduct that placed Sarah in fear of physical injury.

Finally, given that the statutory framework for domestic violence petitions requires courts to consider a "course of conduct,"[23] we conclude the superior court's revisiting of the kneeing incident was appropriate. To prohibit a court from considering past behavior in the context of new alarming acts would defeat the statute's mandate that courts consider the full history of nonconsensual contacts in ascertaining whether stalking occurred.[24] The statute contemplates the reality that repeated nonconsensual acts may place a person in greater fear of physical injury than isolated ones, and it does not require actual physical violence in each instance.[25] Although the court found Sarah was neither placed in fear of imminent physical injury nor physically injured by Vince in the kneeing incident, his continuing course of conduct recklessly placed her in fear of physical injury, which is all the stalking statute requires.[26] The court's consideration of conduct raised in the first domestic violence petition did not violate res judicata.

---

[23]    AS 11.41.270(a)-(b)(1).

[24]    *See* AS 11.41.270(b)(4).

[25]    *See* AS 11.41.270(b)(4)(A)-(I) (including within "nonconsensual contact" definition acts such as "following or appearing within the sight of that person," "appearing at the workplace or residence of that person," and "contacting that person by telephone").

[26]    *See* AS 11.41.270(a).

### 3. Summary

In light of the foregoing, we conclude that neither ripeness nor res judicata precluded the superior court from considering testimony from the first petition in determining whether Vince's course of conduct recklessly placed Sarah in fear of physical injury.

### D. It Was Not Clearly Erroneous To Find That Stalking Occurred.

A court may find stalking in the second degree "if the person knowingly engages in a course of conduct that recklessly places another person in fear of death or physical injury, or in fear of the death or physical injury of a family member."[27]  The statute defines course of conduct as "repeated acts of nonconsensual contact involving the victim or a family member."[28]  Contact is nonconsensual if it is:  (1) "initiated or continued without that person's consent"; (2) "beyond the scope of the consent provided by that person"; or (3) "in disregard of that person's expressed desire that the contact be avoided or discontinued."[29]  Types of nonconsensual contact include, in relevant part: "following or appearing within the sight of that person"; "approaching or confronting that person in a public place or on private property"; as well as "appearing at the workplace or residence of that person."[30]

Vince argues that the superior court failed to make "detailed factual findings" showing that the incident alleged in the second petition was a nonconsensual contact or placed Sarah in reasonable fear of physical injury.  He cites *Petersen v. State* for the proposition that "contact is not nonconsensual merely because it is

---

[27]     *Id.*

[28]     AS 11.41.270(b)(1).

[29]     AS 11.41.270(b)(4).

[30]     AS 11.41.270(b)(4)(A)-(C).

'uncomfortable,' "[31] and he argues that all the incidents alleged in the second petition were consensual because they did not occur outside the scope of "Sarah's consent to contact with Vince" about shared custody. Vince asserts that "there was no evidence presented that Sarah had ever expressed a desire that Vince never contact her at all, or not contact her at her boyfriend's house."

Vince also asserts that the superior court did not explicitly find the December 2016 incidents placed Sarah in fear of physical injury and could not have plausibly done so, because "not knowing why someone knocks on your door is not a reasonable basis to fear physical injury." Vince believes that the court clearly erred when it exclusively relied on the April kneeing incident, which it had previously found did not place Sarah in fear of imminent physical injury, to determine that she was placed in fear by the December incidents.

Vince's arguments are unavailing. The court was not mistaken in its determination that the acts alleged in the petition were nonconsensual, and, contrary to Vince's assertions, the court made factual findings supporting its determination that were not clearly erroneous. Sarah's boyfriend and Vince previously had physically fought on the boyfriend's property, prompting the boyfriend to seek a "no trespass" order against Vince. At the hearing on the first petition, the court explicitly told Vince that he could not "be driving by or acting in a certain way or he could be subject to domestic violence stalking." The court suggested that the parties limit their communications and ordered that the boyfriend have no contact with the children at all. Sarah brought these petitions

---

[31]    930 P.2d 414, 431 (Alaska App. 1996) (discussing stalking statutes and observing that Alaska Constitution protects "a person's right to engage in uncomfortable, distasteful, and annoying contacts — even abrasive confrontations — with other citizens").

because she wanted to further limit her contact with Vince, especially when it came to his interactions with her boyfriend.

Vince's decision to follow Sarah to her boyfriend's house after exchanging the children met all three AS 11.41.270(b)(4)(A)-(C) "nonconsensual contact" definitions. By following Sarah to her boyfriend's house and knocking on the door three or four times, Vince initiated a contact to which Sarah did not consent because she had no notice; the contact fell outside the scope of communicating regarding child custody arrangements, largely because of an order and custody provision Vince had requested that Sarah's boyfriend have no contact with Vince and Sarah's children; and finally, Vince "disregarded [Sarah's] express desire" that in-person contact between herself and Vince, as well as between Vince and her boyfriend, "be avoided or discontinued" in light of past violence and harassment.[32] The second petition thus alleged a new nonconsensual contact that the court could consider in whether Vince engaged in a course of conduct.

It was also not clearly erroneous for the court to find that Vince's course of conduct placed Sarah in reasonable fear of physical injury. Although hearing a knock on a door may not typically give rise to a fear of injury, Vince's argument ignores the context surrounding the relationship between the parties. Even Vince admitted, "with all this that's going on, I probably should not have driven out there with my son so he could get the game." The superior court's decision navigated this context. The court considered evidence of a past violent encounter on Sarah's boyfriend's property; escalating anger in the communications between Vince and Sarah in the 48 hours prior to the incident; and an order prohibiting contact between Sarah's boyfriend and the children. The court therefore reasonably found that Vince's presence on the boyfriend's property, without any notice, was alarming and placed Sarah in fear of physical injury.

---

[32] *See* AS 11.41.270(b)(4).

Combined with testimony from the hearing on the first petition that Vince drove by Sarah's work and kneed her at the school, this was the basis upon which the court found she was placed in physical fear by repeated nonconsensual contacts with him. Contrary to Vince's assertions, the court did not rely on the one incident in which he physically touched Sarah to find fear of physical injury, but rather a course of conduct.

Vince's arguments hinge on the notion that the court should divorce individual incidents from their context and consider in isolation whether a single incident placed the petitioner in fear of physical injury. The statute for stalking in the second degree mandates otherwise, requiring the court to look at a pattern of behavior.[33] Accordingly, we decline to vacate or remand on this ground.

## V.     CONCLUSION

The superior court's decision to grant the long-term domestic violence protective order is AFFIRMED.

---

[33]     *See* AS 11.41.270(a).