NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| LOREN R., | ) | Supreme Court Nos. S-17198/17417 |
| Appellant, | ) | |
| | ) | Superior Court Nos. 3AN-18-00830/ |
| v. | ) | 06027 CI |
| | ) | |
| SHARNEL V., | ) | MEMORANDUM OPINION |
| | ) | AND JUDGMENT* |
| Appellee. | ) | |
| | ) | No. 1777 – July 22, 2020 |

Appeal in File No. S-17198 from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Pamela Scott Washington, Judge pro tem. Appeal in File No. S-17417 from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: Loren R., pro se, Anchorage, Appellant. Notice of nonparticipation filed by Cameron Compton, Law Office of Cameron K. Compton, Anchorage, for Appellee.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices. [Stowers, Justice, not participating.]

## I. INTRODUCTION

A mother petitioned for a domestic violence protective order against the father of their young daughter. She also filed a complaint for custody of the child. The court granted a 20-day ex parte protective order. After a hearing, it also granted the mother's petition for a long-term protective order. The father appealed the order.

---

\* Entered under Alaska Appellate Rule 214.

The superior court held a separate custody trial and granted the mother primary physical and sole legal custody. The court required the father to pay child support. The father then appealed the custody and support orders. We consolidated his appeals in July 2019. Because the superior court did not err when it granted the long-term domestic violence protective order or when it awarded primary physical and sole legal custody to the mother and ordered the father to pay child support, we affirm.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Sharnel V. and Loren R. began dating in 2012.[1]  Their "volatile" relationship continued for six years. Sharnel twice filed petitions for domestic violence protective orders against Loren — the first in March 2015, alleging that he tried to drag her from her home when she refused to leave with him and threw her roommate's belongings out a window. The court granted her petition for a 20-day ex parte protective order; Sharnel did not attend the hearing on her petition for a long-term order.[2]

The couple's daughter was born in December 2015. When Sharnel returned to work after eight weeks Loren cared for the baby.

Sharnel later testified that Loren committed a number of acts of domestic violence, culminating in an incident in March 2018 that prompted her to file a second petition for a domestic violence protective order.

---

[1]    We use initials in lieu of the parties' last names to protect the family's privacy.

[2]    She later testified that although Loren violated the order three times, she did not appear at the long-term hearing because she had learned she was pregnant and wanted to try to work on their relationship.

### B.    Proceedings

On March 26, 2018, Sharnel filed a petition for a domestic violence protective order. She stated that Loren called her at 1:00 a.m. but she did not answer. She said he called her back around 9:30 a.m. When she answered Loren told her that he was going to leave the country for a long time and wanted to see their daughter before he left. Sharnel stated that when she asked why he was leaving, Loren replied, "[B]ecause if I don't leave, I'm going to kill you." In her petition Sharnel also alleged that Loren had a long history of sending her "harassing text messages." A magistrate judge issued a 20-day ex parte protective order and scheduled a hearing for a long-term order.

In early April, Sharnel filed a petition for custody of their daughter. She also filed a motion to reassign the domestic violence case to the same superior court judge as the custody case and to continue the scheduled hearing on the long-term protective order. Both cases were assigned to Superior Court Judge pro tem Pamela Scott Washington.

### 1.    Domestic violence hearing

A hearing on Sharnel's petition for a long-term domestic violence protective order was held in May. Loren failed to appear for the hearing, despite having filed at least four requests to modify or dissolve the 20-day protective order. Sharnel repeated her description of the March 26 phone calls from Loren. She also testified about other incidents of domestic violence.

Sharnel testified that after the March 2015 incident, Loren damaged her furniture while house-sitting. And Sharnel indicated that after she returned to work following their daughter's birth, Loren continued to be threatening and violent. She described the damage Loren did to the house while he was home with the baby — he "bashed in" the oven door, "destroyed" the table, dented a door, broke an espresso

-3-                                                    *1777*

machine, and created "gashes in the floor." She testified that Loren had cut off the baby's hair, giving her a "mullet," and threatened to give the baby a buzz cut if Sharnel questioned his parenting. Sharnel testified that Loren regularly criticized her for "whoredom" and sent her threatening and harassing text messages, many of which were admitted as exhibits during her testimony.

The court made lengthy findings on the record and began by stating that it "was reading through the text messages when . . . [Sharnel] was testifying." The court noted the "alarming things in the text messages and exhibits regarding prior acts of domestic violence." The court then found "by a preponderance of the evidence that the [March 26] incident had occurred" and "that it would qualify as a crime of domestic violence, fear assault." The court explained that it was "looking at the history of domestic violence in order to find that a fear assault occurred." After finding that Loren represented "a credible threat to [Sharnel's] physical safety," the court granted a long-term protective order. The court required Loren not to threaten or commit any acts of domestic violence, stalking, or harassment, and also prohibited him from contacting or communicating with Sharnel in any way.

The next day Sharnel moved for an award of attorney's fees as the prevailing petitioner.[3] The court granted her motion and ordered Loren to pay Sharnel's attorney's fees. Loren later filed a number of motions for reconsideration of the long-term protective order, his "main argument" being that the superior court did not have jurisdiction to enter the order. The court denied reconsideration.

---

[3] AS 18.66.100(c)(14) (allowing court to require respondent to pay successful petitioner's costs and fees); *see Lee-Magana v. Carpenter*, 375 P.3d 60, 64-65 (Alaska 2016) (prevailing petitioner entitled to costs and fees unless "exceptional case").

## 2. Custody trial

### a. Testimony

The court held a custody hearing on January 22, 2019.[4] Loren again failed to appear, despite having filed a number of motions. Sharnel again testified to the history of domestic violence and introduced a number of exhibits.

Sharnel described her relationship with her daughter and her belief about the girl's best interests. She testified that it was important for her daughter to know about her Tlingit heritage. She stated that Loren had repeatedly called her names and made racist remarks about Alaska Natives and other minority groups, and that he believed women were supposed to be home, raising children and listening to men as head of the household. Sharnel testified that she did not want their daughter around such beliefs because they were contrary to "Tlingit values around relationships, [that] men and women are equal."

She stated that Loren did not believe in modern medicine but that he believed in the paranormal. She also called him "delusional" and said that she thought he might have post-traumatic stress disorder based on what she knew about his childhood.

Sharnel also testified about her education and employment. She verified the amount she had paid for daycare and provided receipts documenting her payments. She also testified to the value of the destroyed furniture, providing values based on the prices of similar items for sale online. And she noted that their daughter had never stayed with Loren for more than one night at a time.

---

[4] In early November, both cases had been reassigned to Superior Court Judge Gregory Miller. *See* Alaska R. Civ. P. 42(c)(1); *see also* AS 22.20.022.

Sharnel testified about Loren's employment history and his general financial situation. She disputed Loren's claim that he was fired from his previous job because of the long-term protective order.

Sharnel also presented two witnesses, her daughter's daycare provider and Sharnel's niece. The daycare provider described the girl as "a happy, fun-loving, outgoing, sweet girl" and stated that she had no concerns about Sharnel as a parent. She also testified that Loren had come to the daycare on the day of the 2018 earthquake.[5]

Sharnel's niece, who Sharnel testified was living with her and the child, also testified. The niece testified that she had been "one of the people that was allowed to be a third-party communication between [Loren and Sharnel]" and that in April she had received a disturbing phone call from Loren. She had recorded the call and was allowed to play it for the court. In the recording Loren told her that he was calling "to give [her] a warning" because she had "done a really bad thing by supporting Sharnel" and was "going to be judged for it."

The court then questioned Sharnel's niece about the call. The niece confirmed that she had interpreted Loren's call as a threat and revealed that he had previously texted her "a few times" to tell her "that it wasn't okay what [she] was doing." She testified that Loren saw her as "siding with" Sharnel rather than just being a "median [sic]" for communication about their daughter.

### b.    Findings

At the end of the hearing the court made detailed findings on the record, analyzing the statutory best interests factors in its determination.[6] The court noted that

---

[5]    The protective order in effect at the time prohibited Loren from visiting the daycare location.

[6]    *See* AS 25.24.150(c) ("The court shall determine custody in accordance

(continued...)

given the child's young age, she was not old enough to have a meaningful preference for one parent over the other[7] and that there was no evidence of substance abuse by either parent.[8]

The court addressed the first two statutory factors together — the child's needs and the parents' capability and desire to meet those needs.[9] It noted that the girl was "smart," "happy," "outgoing," and "[b]y all accounts . . . a very well-adjusted child." The court recognized that Sharnel was the girl's primary caregiver and that Loren had never cared for her for more than one night at a time. After discussing Sharnel's job, education, and attention to the child's needs, the court found "no evidence that [Loren] appreciates, understands either [the girl's] needs or what is required to meet those needs." It concluded that Sharnel "comes out ahead on these first two factors, way ahead."

The court then considered "the love and affection existing between the child and each parent."[10] The court found, based on both Sharnel's and the daycare provider's testimony, that Sharnel and her daughter cared greatly for each other. On the other hand, it found that it had "zero evidence that [Loren] has any love or affection for [the child]." The court remarked that Loren "couldn't even bring himself to come into court" and

---

**6**   (...continued)
with the best interests of the child.").

**7**   *See* AS 25.24.150(c)(3).

**8**   *See* AS 25.24.150(c)(8).

**9**   *See* AS 25.24.150(c)(1) ("the physical, emotional, mental, religious, and social needs of the child"), (2) ("the capability and desire of each parent to meet these needs").

**10**   *See* AS 25.24.150(c)(4).

noted that he also had not called into the hearing[11] even though, as was clear from the number of motions he had filed, he was aware of the trial date. The court therefore made the "somewhat unusual finding" that Sharnel "prevails as to this fourth factor."

Turning to the fifth statutory factor, the length of time the child had been in a stable, satisfactory environment and the benefit of continuity,[12] the court found that Sharnel had "provided seemingly a great home for [the child]." And it found that there was evidence, including the "many, many texts pointing to this," that Loren was "not mentally stable," which "absolutely negatively impacts [the child] and his ability to care for [her]." The court concluded that Sharnel prevailed on this factor as well.

The court then considered the sixth factor, each parent's "willingness and ability . . . to allow a close and continuing relationship between the child and the other parent."[13] It commended Sharnel's efforts to try to involve Loren in their daughter's life, encouraging him "to leave his personal attacks aside and to be a dad," and her efforts to ignore Loren's "unrelenting" text messages. The court concluded that Loren had "a complete inability . . . to have even the most common communication courtesies to in any way facilitate the relationship." After listing specific examples of Loren's treatment of Sharnel, including calling her "a slutty [N]ative even though [their daughter] is [N]ative," cutting the girl's hair because he was upset with Sharnel's behavior, and calling Sharnel a "whore," the court stated that it could "count on one hand the cases . . . where [it had] seen a person as disrespectful . . . and as incapable of communicating as [Loren]." The court therefore found that Sharnel prevailed on this factor.

---

[11]    The court stated that its phone line remained open throughout the proceeding.

[12]    *See* AS 25.24.150(c)(5).

[13]    *See* AS 25.24.150(c)(6).

The court devoted special attention to the seventh best interests factor: "any evidence of domestic violence . . . or a history of violence between the parents."[14] After noting that there was a history of domestic violence it detailed the evidence that had been presented in the hearing on the long-term protective order as well as in the custody hearing. The court, recognizing that Judge Washington had found "three instances [which] if you were to count, that might be counted as four instances," found that there had been a total of seven incidents of domestic violence.

The court found that the first incident was the March 2015 one at Sharnel's home that led to the first protective order. It counted Loren's "three to five" violations of that order as the second incident. The third and fourth incidents involved Loren's destruction of Sharnel's property in July 2015 and January 2016, respectively. It counted Loren's text messages to Sharnel in August 2017 as a fifth instance, noting that, among other things, he had called Sharnel a "whore" and "meat carcass." The sixth instance was the one that led to the March 2018 protective order. And the seventh occurred when Loren violated the protective order by going to their daughter's daycare in November 2018.

After finding that Loren had a history of perpetrating domestic violence against Sharnel, the court found "as a matter of law" that Loren could "have no custody of any kind with [the child] until he [overcame] the [statutory] presumption" that prohibited it. Alaska Statute 25.24.150(g) establishes "a rebuttable presumption that a parent who has a history of perpetrating domestic violence against the other parent . . . may not be awarded sole legal custody, sole physical custody, joint legal custody, or joint physical custody of a child."

---

[14]     *See* AS 25.24.150(c)(7).

To overcome the presumption, the court ordered Loren to take and successfully complete a batterers' intervention course.[15] The court recognized that the course was "normally thought to be a 36-week course" and it ordered, "because of the evidence . . . of his lack of mental stability," that any course Loren took "must have a mental health assessment and, as appropriate, [a] treatment component, and he must satisfy that" as well before he could be awarded any form of custody.

After specifying what it meant when it ordered that he could not have "any type of custody," the court stated that Loren could have "supervised visitation and that is all." The court further clarified that "the best-interest[s] factors in no way support that [the] presumption be ignored here or in any way circumvented." The court therefore awarded Sharnel sole legal and primary physical custody of her daughter.

Before turning to "the money part of this [case]," the court discussed the "paternity issue" under the final "catch-all" statutory best interests factor.[16] The court referred to a motion that Loren had recently filed seeking to determine whether he was the father. And it acknowledged that "early on [Loren] perhaps challeng[ed] paternity." But the court found, based on "text after text, and testimony from [Sharnel]," that Loren had a DNA test that he told Sharnel indicated he was the father.

The court addressed child support and other monetary claims at the end of the hearing. After discussing with Sharnel and her attorney the trial brief and exhibits, the court "adopt[ed] [the] numbers" Sharnel had submitted for child support and related expenses. The court requested that Sharnel prepare findings of fact and conclusions of law including legal support for the adopted values. Sharnel listed past unpaid child

---

[15]    *See* AS 25.24.150(j).

[16]    *See* AS 25.24.150(c)(9) ("other factors the court considers pertinent").

support, future child support based on income imputed to Loren, damages for Loren's destruction of her property, attorney's fees, and payments for daycare.

### 3.   Custody and support orders

The superior court issued its written decision on January 29, 2019, documenting each of the findings of fact and conclusions of law it had made on the record. It issued a final child support order on March 3, requiring Loren to pay $611 per month. The court calculated child support based on Loren's income from his last job, after determining that "his mental instability does not rise to [the] level of incapacity for work."[17] It found that Loren was voluntarily and unreasonably unemployed, and it imputed his previous income level as the basis for its support calculation.

The court also issued supplemental findings of fact and conclusions of law "regarding monetary issues," in which it ordered Loren to pay approximately $8,000 for past daycare costs and just over $1,000 for the destruction of Sharnel's property. The court clarified that future daycare costs had been included within its child support calculation. It declined to address attorney's fees at that time.

### 4.   Appeal

Loren filed his notice of appeal of the denial of his motion to reconsider the order granting Sharnel a long-term domestic violence protective order in October 2018. He appealed the court's custody and child support orders in March 2019. We consolidated the appeals. Sharnel is not participating in either appeal.

---

[17]   *See* Alaska R. Civ. P. 90.3(a)(4) (allowing court to impute income to "a parent who voluntarily and unreasonably is unemployed" as long as that parent is not "physically or mentally incapacitated").

## III.  DISCUSSION

### A.  Loren Waived Most Of His Arguments By Failing To Attend The Superior Court Proceedings.

Loren makes a wide range of arguments in his briefs, including factual arguments, evidentiary arguments, procedural arguments, and constitutional arguments. He argues that the court's factual findings in the custody trial were inadequate.  He asserts that there were several evidentiary problems in the protective order: that evidence was hearsay, that it was "spoliated," and that the court improperly considered conflicting evidence.

Loren also argues that the protective order proceedings amounted to criminal proceedings and that he was therefore entitled to the procedural protections granted to criminal defendants.  And he asserts that the custody trial was a child in need of aid (CINA) proceeding that resulted in the termination of his parental rights and that he should have been afforded the procedural protections granted to parents in CINA proceedings.

Finally, Loren argues that the court violated a number of his constitutional rights in both proceedings.  He claims that he was denied his free speech, equal protection, and speedy trial rights, and that he was subjected to double jeopardy, excessive fines, unreasonable seizure, and cruel and unusual punishment.

But "[w]e will not ordinarily consider issues unless they were raised in the trial court."[18]   And even though the "[p]leadings of pro se litigants are held to less stringent standards than those of lawyers,"[19] a self-represented litigant must still

---

[18]   *Reid v. Williams*, 964 P.2d 453, 456 (Alaska 1998) (citing *Brooks v. Brooks*, 733 P.2d 1044, 1053 (Alaska 1987)).

[19]   *Adkins v. Stansel*, 204 P.3d 1031, 1033 (Alaska 2009) (citing *Rathke v.*
(continued...)

"substantively raise [any] arguments below."[20] If the litigant fails to do that, the issue is waived.[21] We have specifically held that arguments relating to factual findings, admission of evidence, superior court procedures, and constitutional issues are waived if not raised before the superior court.[22]

Loren failed to appear at either the hearing on Sharnel's petition for a long-term domestic violence protective order or the trial to determine who would have custody of their daughter. By failing to participate in either hearing, he, by definition, failed to raise any of issues to the superior court that he now argues amounted to errors by the court. Loren waived these arguments and cannot raise them now on appeal.

## B. Loren Was Not Entitled To The Procedural Protections Given To Criminal Defendants Or Parents In CINA Proceedings.

"Whether there was a violation of due process is a question of law."[23] "We review questions of law de novo, adopting 'the rule of law that is most persuasive in light

---

[19] (...continued)
*Corr. Corp. of Am.*, 153 P.3d 303, 308-09 (Alaska 2007)).

[20] *Karen L. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 953 P.2d 871, 880 n.13 (Alaska 1998) (citing *Arnett v. Baskous*, 856 P.2d 790, 791 n.1 (Alaska 1993)).

[21] *See, e.g.*, *Berry v. Berry*, No. S-17232, 2019 WL 6724423, at *3 n.6 (Alaska Dec. 11, 2019); *Karen L.*, 953 P.2d at 880 n.13; *Arnett*, 856 P.2d at 791 n.1.

[22] *See Berry*, 2019 WL 6724423, at *1 (waiver of constitutional arguments); *Bartels v. Bartels*, No. S-13148, 2009 WL 2973557, at *4 (Alaska Sept. 16, 2009) (waiver of factual arguments); *Sherbahn v. Kerkove*, 987 P.2d 195, 199 (Alaska 1999) (waiver of evidentiary arguments); *In re C.L.T.*, 597 P.2d 518, 522 (Alaska 1979) (waiver of procedural arguments).

[23] *Vince B. v. Sarah B.*, 425 P.3d 55, 60 (Alaska 2018) (citing *D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 207 (Alaska 2000)).

of precedent, reason, and policy.' "[24]  Loren claims that he was denied procedural protections in both the domestic violence proceedings and in the custody case.

### 1.    Criminal procedures

Loren argues that the domestic violence protective order proceedings were really criminal proceedings, and that he was entitled to the same rights as a defendant in a criminal case, including the right to counsel and the right to a speedy trial.  Although he is correct that the court found his conduct amounted to "a fear assault,"[25]  Loren was not charged with or convicted of any crime.  Nor did the court find beyond a reasonable doubt that he had committed an assault.  Instead the court made a civil finding by a preponderance of the evidence that Loren's conduct qualified as a domestic violence crime and on that basis determined that Sharnel was entitled to a protective order against him.  Because Loren was not charged with or convicted of a crime, and the hearing on the long-term order was not a criminal trial,[26] he was not entitled to the procedural protections granted to criminal defendants.[27]

### 2.    CINA procedures

Loren also contends that the custody case was really a CINA case and he was therefore entitled to CINA procedural protections.  And he asserts that he was entitled to appointed counsel to represent him.

---

[24]    *D.M.*, 995 P.2d at 207 (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979)).

[25]    *See* AS 11.41.230(a)(3).

[26]    *See* 21 AM. JUR. 2D *Criminal Law* § 1 (2008) (recognizing that a criminal trial is "a judicial proceeding in the government's name").

[27]    *See* 21A *id.* § 880 (listing procedural protections in criminal trials).

Loren is mistaken. In a CINA case, it is the State's interference with a parent's fundamental right to raise a child that necessitates the protective procedural measures that Loren listed.[28] But the State is not involved in this case: it is a custody dispute between the child's two parents.[29] Nor did the court terminate his parental rights. By restricting him to supervised visitation until he takes the steps necessary to overcome the statutory presumption against custody, the court merely followed the law based upon its findings about Loren's conduct. Loren is not entitled to the procedures and protections afforded parents in CINA cases.

Loren argues that he has a right to counsel even if the custody case is not a CINA case. But unrepresented parents in custody disputes with parents who have hired private counsel generally do not have a due process right to appointed counsel.[30] Sharnel is not represented by a public agency; she hired an attorney. Loren has not demonstrated that he qualified for an exception to the general rule.[31]

## IV. CONCLUSION

We AFFIRM the superior court's orders.

---

[28] *See Alex H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 389 P.3d 35, 48 (Alaska 2017) (quoting *Seth D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1222, 1227 (Alaska 2008)).

[29] *See* AS 47.10.010.

[30] *Dennis O. v. Stephanie O.*, 393 P.3d 401, 406-11 (Alaska 2017).

[31] *Cf. id.* at 409-11 (evaluating individual's claimed due process right to counsel despite general rule that class of parents in custody matters opposed by parents with private counsel do not have automatic due process right to court-appointed counsel).